Opinion issued June 4, 2007


 



 


 








In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-06-01146-CR

____________


CHRISTOPHER COOLEY, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 179th District Court

Harris County, Texas

Trial Court Cause No. 1094650






O P I N I O N

 Appellant, Christopher Cooley, challenges an aggregate bail of $750,000 for
three solicitation of capital murder charges. Specifically, Cooley challenges the trial
court's refusal to lower the $250,000 bail set in Cooley's original solicitation for
capital murder case and the trial court's setting bail at $250,000 each for two
subsequently filed solicitation of capital murder cases. We affirm.

I. Factual Background

 On November 23, 2006, the State took Cooley into custody, executing an arrest
warrant issued by a magistrate on the strength of an affidavit in which Houston Police
Department Sergeant Frank Quinn swore that, in case number 1094019, he had
information that on November 19, 2006, Cooley instigated, planned, and funded a
plot to kill Cooley's business partner, Charles Zubarik. Cooley requested the trial
court lower his bail to $30,000. The trial court set a hearing on the request for
December 1, 2006. 

 The day before the bond reduction hearing, the State filed against Cooley two
additional solicitation of capital murder cases, case numbers 1094815 and 1094816,
alleging that in April 2005 and on May 5, 2005, Cooley solicited persons to kill
Zubarik. The District Attorney recommended bail be set at "no bail" in each of these
latter two cases. At the hearing, Cooley requested and the trial court agreed to
include the bail settings of these two latter cases in the writ hearing, along with the
bail setting in the original case.

A. Sergeant Quinn's Affidavit

 1. Information Based on Informant Wade's Statement

 The State introduced into evidence the affidavits of Sergeant Quinn, exhibits
1-4. These affidavits were the complaints sworn out by Quinn to support his
successful requests for the issuance of arrest warrants for Cooley and co-defendants,
Celso Castillo, George Argueta, and Adrian Beltran. In exhibit 4, Quinn avers that
a police informant, Michael Wade, told Quinn that Argueta introduced Wade to
Castillo, an employee of Genesis Air Support (GAS). Castillo told Wade that a silent
partner (1) was interfering with some of their activities and, therefore, they wanted to
have him killed. Castillo also told Wade that he had tried to kill the silent partner in
Houston about a year ago, shooting him in the shoulder. Castillo arranged to meet
with Wade again in Dallas on November 20, 2006, to view the silent partner's home
and worksite, supply Wade with a 9 mm pistol, and pay him $2,000 up front. Castillo
agreed to pay $15,000 to Wade upon killing the silent partner.

 At a subsequent meeting, on November 19, 2006, Argueta and Castillo told
Wade that the company's owner wanted the silent partner killed because the silent
partner was interfering in the company's activities. At this meeting, Argueta and
Castillo told Wade that the owner had already obtained a "piece" for Wade to use. 

 On Monday, November 20, 2006, in Dallas County, Wade met Castillo and
Argueta, who arrived in a white pick-up truck, later determined to be registered to
Cooley. Co-defendant Mark Gregulak, the GAS Dallas station manager, was also
present. Castillo and Argueta showed Wade the warehouse where they wanted Wade
to make the "hit." They told him that Cooley was going to make sure that the target
was present. Argueta and Castillo showed Wade the pistol and $2,000, and then gave
them to Wade's companion, under cover officer Cantu, who posed as Wade's
accomplice. The police electronically monitored and recorded the meeting. Quinn
arrested Castillo and Argueta, both of whom gave confessions in which they stated
that Cooley was the person who instigated, planned, and funded the plot to kill
Zubarik.

 2. Castillo's Confession

 In his confession, Castillo states that, two or three weeks before the offense,
Shawn Edwards, also a GAS employee, told him that Cooley wanted to talk to him. 
Cooley told Castillo that Edwards would drive them to Dallas, and Mark "Greg-something" would have the money. When they met in Dallas, Castillo took the
money from Grugelak and told Wade to call Argueta when the job was done.

 3. Argueta's Confession

 In his confession, Argueta states that he was a GAS employee and that Castillo
was Cooley's right-hand man. In May 2005, he and Castillo arranged for Adrian
Beltran, another GAS employee, to shoot Zubarik in Houston upon Zubarik's
departure from a dinner meeting with Cooley. Argueta stated that later that same
night he went to Castillo's house, picked up about $7,000, and paid Beltran $4,000. 

B. Sergeant Quinn's Hearing Testimony

 Quinn testified that he knew about the attempts to kill Zubarik on May 2, 2005,
and on November 20, 2006, but from Argueta's confession, Quinn learned about
another attempt, made on or about April 30, 2005. In Argueta's confession, Argueta
told Quinn that Castillo told Argueta where to intercept Zubarik, and that the message
was relayed through Cooley. It was Cooley who wanted Zubarik dead. Castillo
furnished Argueta with the glock, which Argueta attempted to fire, but it
malfunctioned. May 2, 2005 became the next attempt to kill Zubarik. 

 The November 20 meeting was videotaped and from it Quinn identified
Castillo, Argueta, Gregulak, and Edwards. Based on Quinn's investigation, on each
of the three attempts, it was Cooley who wanted Zubarik dead.

 Quinn further testified that all the people involved in the murder plot, including
the ones in the Dallas area, have been arrested. He further testified that in his nearly
30 years with the Houston Police Department, he has never seen a case in which the
defendant tried to kill the same person three times.

 On cross-examination, Quinn testified that Cooley has no criminal record of
convictions or arrests, that Quinn has some recorded phone conversations of Cooley,
which he believes corroborate Cooley's involvement in the plot to kill Zubarik; and
that Cooley is not on any of the videos compiled in the case. Quinn is in the process
of getting Cooley's phone call records.

C. Zubarik's Testimony

 Zubarik testified that in 1992, he met Cooley, a representative for another
company, and he observed him to be hard-working, competent, and smart. In 1997,
Zubarik and Cooley formed GAS with Zubarik as a silent partner, contributing seed-
money capital, and Cooley, as the managing partner. GAS is an air cargo handling
warehousing company. Today, GAS is worth three to nine million dollars, and it has
facilities in Houston, Dallas, San Antonio, Detroit, and Atlanta. During the
company's first three years, Zubarik took no money from the company and Cooley
took whatever he made. In 2000, Cooley and Zubarik received equal shares in GAS
and agreed that each would receive a $100,000 annual salary. Cooley lived up to his
agreement regarding the operation of the company. Cooley treated Zubarik decently
and Zubarik considered him a friend. 

 Zubarik testified that in the week before the hearing, he reviewed the
company's records and found that, without Zubarik's knowledge, Cooley took two
million dollars from GAS over the previous four years. This is Zubarik's best
estimate, based on examination of company records, talking to the CPA, and
discussions with the bank. 

 As a 50 percent owner of the company, Zubarik has the right to demand an
accounting of the company, but Cooley repeatedly resisted that. Zubarik has spoken
to his attorney about getting an accounting, but he has taken no overt steps toward
that goal. GAS has approximately $14 million in gross income. It has assets,
equipment, debt, and contracts. The company has excessive costs, cash flow
problems, and there have not been any profits.

 Zubarik testified that there is an account in New Jersey in Cooley's wife's
name with an undetermined amount of money. Cooley put his wife on the company
payroll for $36,000 to $37,000 per year, but she never went to work for the company. 
Cooley also has a retirement account and a boat of undetermined values. Zubarik
testified that Cooley owns a house valued at more than $600,000 in 2006. Zubarik
understands that the house is free and clear of indebtedness. Investigation of the
company records shows that Cooley has been making payments from company funds
for a home equity loan.

 Genesis Transportation Company (GTC) is a second company owned 50
percent each by Zubarik and Cooley. Genesis Holdings (GH) is a third company.
Zubarik does not have any interest in GH and knows very little about it. However, 
he has discovered money transfers between the two Genesis companies, GAS and
GTC, in which he has an interest, and GH. He understands that during the last year,
customers paid something like $360,000 into GH.

 In 2002, Zubarik and Cooley entered into an agreement whereby they
purchased one million dollar insurance policies, naming each other as beneficiaries
of their respective policies. If either of them died, the other was to use the policy
proceeds to pay the deceased person's wife one million dollars for the deceased
person's share of the stock in GAS. Up until Zubarik was shot in 2005, he thought
he and Cooley were each insured for one million dollars. While recovering in the 
hospital, however, he learned from Cooley that they were both insured for two million
dollars. 

 Zubarik and Cooley had hired an attorney to draft a new buy-sell agreement. 
The attorney recommended that Zubarik and Cooley name their wives to be the
beneficiaries of their respective policies instead of designating each other as
beneficiaries. 

 On the evening of May 2, 2005, Zubarik had dinner with Cooley and Ed Pasko.
Shortly after they left the restaurant, someone shot Zubarik, severing his right hand
from his arm. Just before the ambulance arrived, Cooley arrived at the gas station
Zubarik had managed to pull into after he was shot. At the time, Zubarik never
suspected that Cooley was involved in the shooting.

 During the last 48 hours, Zubarik has had police protection inside and outside
his Farmer's Branch home, but they do not have the manpower to continue to do that. 
Zubarik is fearful there are still unknown others involved in the plot to kill him. 

 Zubarik has not visited GAS's Houston office since the events leading to
Cooley's arrest. 

D. Dawn Cooley's Testimony 

 Dawn Cooley testified that she is Cooley's wife of 13 years and the mother of
their four sons, ages five, seven, nine and 12. Their youngest son has a genetic
disease that causes tumors. This condition creates the need for a high degree of
attention from her and Cooley with whom the son has a good relationship, as do their
other sons. Dawn testified that she also has medical problems, including rheumatoid
arthritis and some heart issues. She is in extreme pain from the arthritis and, once a
week, she has to have a medication injection. Cooley's assistance to her with that
condition is extremely helpful and she does not think she could cope with it without
him. At times, to get her to the doctor to receive her intravenous doses of steroids,
Cooley has to carry her and physically push her into the vehicle. Cooley keeps her
mobile and helps her with the children. Her father from Buffalo, New York is here
now supporting her in this crisis.

 The medical conditions generate medical costs that GAS's health care
insurance carrier pays. Since the State charged Cooley with these offenses, Zubarik
has retained counsel and taken measures to gain control of GAS. Dawn has retained
counsel to protect her interest and her medical insurance. 

 Before coming to court, Dawn discussed with a bail bondsman the bail bonding
process and her assets. She does not have a New Jersey bank account as Zubarik
discussed, or is not aware of it. At one time she and Cooley had a 401(k) account, but
it was dissolved and she does not know what was done with the money that came
from it. She and Cooley have a life insurance policy, the equity from which she is
going to use to help with her legal expenses and bonding fees. There is still a lien on
their home, but she does not have even an approximate idea of what the monthly
payments against it are. Based on the information that she provided to the bondsman
about her personal financial condition, the bondsman agreed to post approximately
a $50,000 bond for Cooley. She is not able to post a $250,000 bond.

 Dawn testified that when GAS first started, she worked for it typing and doing
small proposals. She did clerical work for the company from time to time. She is not
currently employed.

 Cooley is a good father, who is involved with his sons sports activities. She
and Cooley are members of an Atascocita church. 

E. Cooley's Counsel's Statement on Bail Conditions

 After the close of Cooley's evidence, Cooley's counsel commented to the trial
court that there are plenty of conditions that the court could place on Cooley
including home confinement and an ankle monitor, in place of high bail.

F. Trial Court's Decision

 At the conclusion of the bond hearing, the trial court stated that it had
considered the nature of the offenses alleged and the circumstances under which they
were committed, the ability to make bail, and the future safety of the complainant and
the community. The trial court refused to lower the $250,000 bail in the original
solicitation of capital murder case and set it at $250,000 in each of the two new
solicitation of capital murder cases.

II. Standard of Review

 The standard for reviewing bail settings is whether the trial court abused its
discretion. See Ex parte Rubac, 611 S.W.2d 848, 849, 850 (Tex. Crim. App. 1981); 
Ex parte Ruiz, 129 S.W.3d 751, 753 (Tex. App.--Houston [1st Dist.] 2004, no pet.). 
In the exercise of its discretion, a trial court should consider the following factors in
setting a defendant's bail:

 1. The bail shall be sufficiently high to give reasonable assurance that
the undertaking will be complied with.


 2. The power to require bail is not to be so used as to make it an
instrument of oppression.


 3. The nature of the offense and the circumstances under which it was
committed are to be considered.


 4. The ability to make bail is to be regarded, and proof may be taken
upon this point.


 5. The future safety of a victim of the alleged offense and the
community shall be considered.


Tex. Code Crim. Proc. Ann. art. 17.15 (Vernon 2005); see Ludwig v. State, 812
S.W.2d 323, 324 (Tex. Crim. App. 1991) (noting that court is "to be governed in the
exercise of [its] discretion by the Constitution and by the [article 17.15 factors]"). 
The burden of proof is upon a defendant who claims bail is excessive. Rubac, 611
S.W.2d at 849; Ex parte Martinez-Velasco, 666 S.W.2d 613, 614 (Tex.
App.--Houston [1st Dist.] 1984, no pet.). In reviewing a trial court's ruling for an
abuse of discretion, an appellate court will not intercede as long as the trial court's
ruling is at least within the zone of reasonable disagreement. Ex parte Beard, 92
S.W.3d 566, 573 (Tex. App.--Austin 2002, pet. ref'd) (citing Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App.)). But an abuse of discretion review requires
more of the appellate court than simply deciding that the trial court did not rule
arbitrarily or capriciously. Beard, 92S.W.3d at 573; Montgomery, 810 S.W.2d at 392. 
The appellate court must instead measure the trial court's ruling against the relevant
criteria by which the ruling was made. Id. 

The primary purpose for setting bond is to secure the presence of the defendant
in court at his trial. Ex parte Vasquez, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977);
Ex parte Bonilla, 742 S.W.2d 743, 744 (Tex. App.--Houston [1st Dist.] 1987, no
pet.). The amount of bail should be set sufficiently high to give reasonable assurance
that the accused will comply with the undertaking, but should not be set so high as
to be an instrument of oppression. Ex parte Bufkin, 553 S.W.2d 116, 118 (Tex. Crim.
App. 1977); Ex parte Willman, 695 S.W.2d 752, 753 (Tex. App.--Houston [1st Dist.]
1985, no pet.). Courts should also consider the defendant's work record, family ties,
residency, criminal record, conformity with previous bond conditions and aggravating
factors involved in the offense. See Rubac, 611 S.W.2d at 849.

III. Discussion

A. Nature and Circumstances of the Offense

 In considering the nature of the offense, it is proper to consider the possible
punishment. Vasquez, 558 S.W.2d at 479-80. The State charges Cooley with three
instances of solicitation of capital murder, a first degree felony, carrying a
punishment range of five to 99 years or life imprisonment and a fine not to exceed
$10,000. See Tex. Pen. Code Ann. § 15.03(a) (Vernon 2003); Tex. Pen. Code Ann.
§ 12.32(a), (b) (Vernon 2003). If convicted, the least punishment Cooley could
receive is five years of community supervision. Tex. Code Crim. Proc. Ann. art.
42.12 § 3(a),(b); or 4(a),(b) (Vernon Supp. 2006). If convicted, the most punishment
Cooley could receive is life imprisonment.

 The alleged offenses are serious, carrying substantial penalties. The record
contains prima facie evidence that business-owner Cooley, to avoid being caught in
illegal activities, premeditatedly and persistently orchestrated multiple attempts to
assassinate his business partner of nine years. There is evidence that for the financial
gain he offered them, Cooley induced his subordinates, the employees of Cooley's
and Zubarik's company, to become co-conspirators in taking Zubarik's life. Evidence
in the record reflects that when the first attempt failed because the gun malfunctioned,
a week later, Cooley lured Zubarik to a meeting and had his co-defendants lie in wait
until they left the restaurant. Evidence in the record reflects that one of them drove
beside Zubarik's car while another fired a shotgun at the driver's side of Zubarik's
car, causing permanent injury to his right hand and arm. Record evidence reflects that
because Zubarik survived that attack, Cooly organized a third attack.

 Cooley contends that the trial court should have considered that the State
offered no independent evidence to corroborate the testimony of his co-defendants
as required by Texas Code of Criminal Procedure Annotated article 38.14 (Vernon
2005). Article 38.14 does not, however, establish evidentiary standards for a bond
reduction hearing, in contrast to that necessary to obtain a conviction. Moreover, one
of the vehicles driven to the meeting in Dallas was registered to Cooley.

 Cooley cites to us the following capital murder cases in which courts of appeals
have lowered bails: Ex parte Mc Donald, 852 S.W.2d 730, 734-35 (Tex. App.--San
Antonio 1993, no pet.); Eggleston v. State, 917 S.W.2d 100, 101 (Tex. App.--San
Antonio 1996, no pet.); and Ex parte Milburn, 8 S.W.3d 422, 427 (Tex.
App.--Amarillo 1999, no pet.).

 In Ex parte Mc Donald, the State accused McDonald of intentionally killing
his ex-wife by cutting her with a knife while kidnapping and attempting to kidnap
her. The trial court refused to lower the $1,000,000 bail. The court of appeals
lowered the bail to $75,000. While McDonald weighs in favor of lowering bail
because it involves a higher grade offense than here and it is analogous to this case
in that a member of McDonald's household relied on him for assistance with her
medical condition, id. at 735, there are several distinguishing features. McDonald
turned himself into police before they knew an offense had been committed, id.,
whereas in the instant case, there is evidence that Cooley saw the results of the second
botched murder attempt, visited Zubarik in the hospital, and then instigated and
organized a third attempt. In McDonald there was evidence that he had $850 in the
property room, $300 in the commissary, that he had no checking or savings account,
he owned no stocks, bonds, mutual funds, or real estate; and testified he could not
raise the $100,000 premium to make the $1,000,000 bail. Id. Cooley introduced no
evidence of cash he had on hand, money he had in checking or savings accounts, the
value of stocks, bonds, mutual funds, or real estate he owns. Cooley owns half of a
multi-million dollar air freight business and did not introduce evidence that revenues
from it were unavailable to him.

 Eggleston and Milburn are similarly distinguishable. In Eggleston, the State
accused Eggleston of beating his nine-year-old son to death. Id. at 101. After a bond
reduction hearing, the magistrate refused to lower the $1,000,000 bail. Id. The San
Antonio Court of Appeals reduced bail to $300,000, a bail that is higher than that set
for each offense in this case. In Milburn, the State accused Milburn of intentionally
and knowingly causing the death of a child under six by blunt force trauma to the
abdomen. Id. at 423. After Milburn's arrest, he was denied bail. Id. Following a
habeas corpus hearing, the trial court set bail at $2,000,000 surety bond and $500,000
cash bond. Id. The Amarillo Court of Appeals lowered Milburn's bail to $100,000. 
Id. at 427. Unlike the evidence here, however, the evidence in Milburn was that
Milburn had little ability to pay and that Milburn's father would post bail.


B. Sufficient Bail to Assure Appearance But Not Oppress

 From the record, the trial court could have reasonably concluded that Cooley 
did not carry his burden to establish that $750,000 was an unreasonable amount to
assure appellant's appearance at trial or that it was being used as an instrument of
oppression. There was evidence that Cooley had a one-half interest in a company
valued between three and nine million dollars. If the trial court considered only the
low end of that valuation, Cooley's interest would be one and one-half million
dollars. The record contained evidence that Cooley was a one-half owner in a second
company, Genesis Transportation Company (GTC), the valuation of which Cooley
did not establish. Zubarik testified that he estimates that in the last four years, Cooley
has taken out of GAS, without Zubaik's knowledge, approximately two million
dollars, over and above his salary. Zubarik testified that Cooley has a retirement plan
of undetermined value and a 401k plan. Dawn testified that she and Cooley had a
401k plan at one time, but it was dissolved and she does not know what happened to
the money. She did not testify how much money was in it before it was liquidated. 
Dawn testified that she and Cooley own a life insurance policy and that she is trying
to arrange to use the equity in it for legal and bond fees, but she did not testify what
the value of that equity is. The record contains undisputed evidence that Cooley
owns a boat, but he did not establish its value. Cooley adduced no explicit evidence
concerning whether as community or separate property he owned other personal or
real property.

 Based on Dawn's meeting with the bondsman, Cooley contends that the record
establishes that he can post a bond of no more than $40,000. Based on the testimony
in the record, however, the trial court could have reasonably concluded that the bail
bondsman's bond quote was not based on the combined assets of Dawn and Cooley,
but rather, on Dawn's disclosure of assets available to her.

 There is no evidence in the record to suggest that Cooley is a flight risk. 
Zubarik testified that in the early phase of their business, Cooley lived up to their
agreement concerning the company's operation. There is evidence of Cooley's family
ties and his assistance with family medical conditions. Nevertheless, the record
contains ample evidence of access to large sums of money, which the trial court
could have combined with the realistic possibility of assessment of substantial prison
time to conclude that this factor favored a high bond setting. 

C. Ability to Make Bail

 Just as a defendant's inability to afford bail does not, in itself, demonstrate that
bail is excessive, a defendant's ability to afford bail in the amount set does not, in
itself, justify bail in that amount. Beard, 92 S.W.3d at 573. This factor will not favor
bond reduction, however, when the defendant makes vague references to inability to
make bond without detailing his specific assets and financial resources. See, e.g. Ex
parte Scott, 122 S.W.3d 866, 870 (Tex. App.--Fort Worth 2003, no pet.) (in
affirming trial court's refusal to lower bond, court cited as a factor absence of
evidence regarding defendant's ability to make bond when defendant's evidence
consisted of his testimony that he and his family lacked sufficient assets or financial
resources to post the bond, but he did not detail either his or his family's specific
assets and financial resources, nor did he explain what efforts, if any were made to
furnish the bond). In Ex parte Chavfull, 945 S.W.2d 183 (Tex. App.--San Antonio
1997, no pet.), a capital murder bond reduction case, at the bond hearing, Chavfull's
sole witness was his mother who testified that Chavfull was a college student, he was
not working before he was arrested, he did not have any money, and that she and her
family could perhaps raise $1,000. Id. at 186. As the San Antonio Court of Appeals
observed, "We don't know what his bank account is, if he has a bank account, if he
owns stocks. We know nothing about the defendant's financial condition, that is his
financial condition." Id. (Emphasis added). Similarly, from Dawn's failure to testify
in detail about Cooley's bank accounts, retirement account, his stock, and other
personal property, especially in light of Zubarik's testimony about Cooley's assets,
the trial court could have reasonably concluded that, as to the defendant's financial
circumstances, the testimony was "inconclusive." Id. The San Antonio court cited
this inconclusive evidence of the defendant's financial condition as one of the factors
in its conclusion to affirm the trial court's refusal to lower bail from $750,000. Id.
at 187. 

D. Safety of the Victim and the Community

 In determining the appropriate amount of bond, the future safety of the victim
of the alleged offense and the community is to be considered. Tex. Code Crim.
Proc. Ann. Art. 17.15(5) (Vernon 2005). Zubarik testified that he gave the
prosecutor the names of two more people who are closer to Cooley than to him, who
he thinks may be involved in the murder plot. On the other hand, Quinn testified that 

everyone the police know to be involved in the murder plot has been arrested and that
there are no more people possibly involved to be investigated, but something could
arise. It is not clear whether this included the two people about whom Zubarik
testified. 

 Cooley asserts that Zubarik's fears are unfounded because he, Cooley, has no
criminal history or history of violence, is described as a great husband, a great
partner, a successful, smart, highly-motivated businessman, a compassionate father
tending to his children and ailing wife, a seven-year Houston resident, with
significant ties to the Kingwood community where he has a home, mortgage, children
involved in school and sports activities, and who attends church in nearby Atascocita. 
The trial court reasonably could have discounted this evidence, given testimony about
the murder for hire plot, and the amount of money that Cooley had access to while
running the company. 

E. Other Factors

 Record evidence indicates that Cooley has not previously been arrested or
convicted of criminal activity. Accordingly, Cooley has no history of noncompliance
with bond conditions. This weighs in favor of a lower bond. Mitigating against the
lowering of the bond is the evidence of the aggravating factors in the alleged offense
of the number, at least six known people, Cooley allegedly employed to kill Zubarik,
and the amount of money he allegedly paid, at least $24,000.

 Cooley asserts that in Ex parte Beard, the Austin court of appeals cites Ludwig
v. State, 812 S.W.2d 323, 324-25 (Tex. Crim. App. 1991) (2) as support for the position
that any bail over $250,000 is suspect, except in extenuating circumstances. Beard,
92 S.W.3d at 571. In Ex parte Bogia, (3) 56 S.W.3d 835 (Tex. App--Houston [1st
Dist.]. 2001, no pet.), this court said, "At the $360,000 level, bail is oppressive unless
justified by unusual circumstances." Id. at 840. Based on the evidence before the
trial court, it reasonably could have concluded the bail it set was justified by unusual
circumstances. The trial court had before it evidence that because Zubarik was
interfering in activities at GAS and/or to obtain key man life insurance proceeds,
Cooley induced four GAS employees and two other hired hit men, to attempt, on
three separate occasions over 19 months, to kill his business partner. The trial court 
could have reasonably concluded a high bond was necessary to deter Cooley from
further attempts on Zubarik's life.








IV. Conclusion

 We hold that the trial court's decision to set bail at $250,000 per solicitation
of murder charge is not outside the zone of reasonable disagreement. (4) We overrule
Cooley's point of error and affirm the trial court's judgment.

 

 Jane Bland

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.


Publish. Tex. R. App. P. 47.2(b).

1. The silent partner was Zubarik.
2. This case is distinguishable from Ludwig in the following respects: (1) the
circumstances of Ludwig's crime were not developed at the habeas corpus
hearing, (2) Ludwig's assets were frozen by a temporary court order, and (3)
Ludwig had several close relatives who were willing to sign a bond insuring
his appearance at trial. Ludwig, 812 S.W.2d at 324.
3. This case is distinguishable from Bogia in the following respects: (1) it is a
second degree felony and this case is a first degree felony, (2) it is a non-violent property crime whereas this case involves attempted murder for hire,
(3) the circumstances of the alleged crime may not outrage a jury, whereas the
circumstances of this case are likely to outrage a jury, and (4) there is no
evidence that Bogia would be a threat to the community. Bogia, 56 S.W.3d at
839-40. 
4. Ex parte Henson, 131 S.W.3d 645, 651 (Tex. App.--Texarkana 2004, no pet.)
(ordering bail reduced from $750,000 on each of three capital murder counts
because such bond setting was without precedent, but set at $500,000 on each
count for a total bond of $1,500,000 because of evidence of nature of offense
being a violent, unprovoked killing of three innocent and unsuspecting persons
during commission of aggravated robbery); Sherman v. State, No. 01-06-00466-CR; 2007 Tex. App. LEXIS 92 (Tex. App.--Houston [1st Dist.] January
9, 2007, no pet.) (affirming $250,000 bond on murder case in which defendant
had significant assets of unestablished value); Ex parte O'Neal, No. 05-04-00707-CR; 2004 Tex. App. LEXIS 6385 (Tex. App.--Dallas July 16, 2004, no
pet.) (not designated for publication) (in murder case, reducing bail from
$2,000,000 to $750,000)