Opinion issued December 8, 2011

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00601-CR

———————————

 

EX PARTE Jessica Tata, Applicant



 



 

On Appeal from the 180th District Court

Harris County, Texas



Trial Court Case No. 1306073

 



 

O P I N I O N

          Applicant,
Jessica Tata, is charged with nine offenses: 
four counts of felony murder, two counts of reckless injury to a child,
and three counts of abandoning a child.[1]  The trial court set bail at $50,000 for each
of the abandoning a child charges, $75,000 for each of the reckless injury
charges, and $200,000 for each of the felony murder charges, for a cumulative
bail amount of $1,100,000.  Applicant
filed an application for a writ of habeas corpus and bond reduction, which the
trial court denied.  In three issues on
appeal, applicant contends that the bond amounts set by the trial court are
excessive pursuant to the Eighth Amendment of the United States Constitution, Article
I, Sections 10, 11, and 13 of the Texas Constitution, and articles 1.07 and
1.09 of the Texas Code of Criminal Procedure.

          We
affirm.

Background

          At
applicant’s bail reduction hearing, Houston Fire Department Investigator D.
Green testified that he investigated a fire that occurred on February 24, 2011,
at a home day-care center operated by applicant.  For the purposes of this hearing, the parties
stipulated that, as a result of this fire, four young children died and three
other children were injured, two of them seriously.  Investigator Green testified that the fire
started on the stovetop and that the cause of the fire was “cooking oil in a pan
on the stovetop.”  He further testified
that, although applicant had made a statement that she was in the restroom at
the time the fire started, he observed applicant at the scene and did not
notice any physical evidence, such as soot on her clothing or any injuries,
that indicated she had been inside the house. 
He stated that he later viewed a surveillance video from a Target store,
located approximately three minutes from the day care, that depicted applicant
shopping at the Target at the time the fire started.

          Applicant
was taken to the hospital and Investigator Green attempted to speak with her and
obtain a statement.  He characterized her
family’s attitude as “uncooperative,” and testified that her brother “felt like
[Green] was harassing [applicant] just to get a statement.”  When Green spoke to applicant, “she stated
that she was in shock and . . . she didn’t know why she was
in the hospital and she didn’t know what [Green] was talking about.”  Based on his experience as an E.M.T., Green
did not believe that applicant was in shock, and he testified that he believed
she “was being deceptive.”  The trial court
admitted an audio recording of Investigator Green’s conversation with applicant
at the hospital, which included Green’s statement that he would “be contacting
[applicant] at a later date.”  Green
returned early the next morning to speak with applicant before she was
discharged from the hospital, but he could only speak with applicant’s sister
and applicant’s friend, who informed Green that they were taking applicant to the
friend’s house.

          Later
the next day, two fellow officers attempted to obtain a statement from
applicant, but she informed the officers that she wished to speak with her
attorney before she gave a statement.  The
officers did not have a chance to obtain a statement because they “[wound] up
getting a tip that [applicant] was leaving the country.”  Investigator Green went to applicant’s
family’s house to speak with her family members, but he “was never able to talk
to anyone when [he] went there.”

          On
cross-examination, the trial court admitted the audio recording of applicant’s
9-1-1 call, and Investigator Green acknowledged that a witness to the fire had
said that he observed applicant bringing two children out of the burning house.[2]  Green stated that when he spoke to applicant,
he was not trying to “pin the blame” on her but was merely “trying to get some
answers” about the fire and the surrounding circumstances.

          Houston
Police Department Officer C. Helton, who is assigned to the Gulf Coast Violent
Offenders Task Force division of the U.S. Marshals, also testified at the
hearing regarding his role in the search for applicant after she left the
country.  Officer Helton testified that
applicant flew to Lagos, Nigeria, on February 26, 2011, two days after the
fire.  He also testified that applicant
had booked a return flight to Dallas for March 18, 2011.  He stated that applicant left the country on
an “international passport.”

          Officer
Helton testified that he spoke with applicant’s mother and sister and that they
did not provide any information that assisted officials in locating applicant
in Nigeria.  He stated that he learned,
from speaking to the family, that they have friends and family in Nigeria and
that they make annual trips to Nigeria.  Officer
Helton testified that applicant was ultimately found in Port Harcourt, Nigeria,
and that she did not turn herself in to the authorities.  He stated that Interpol and Nigerian
officials had spoken with applicant’s father, who lives and works in Nigeria,
and he informed the officials that he had not spoken to applicant.  When the officials discovered an airline
ticket with applicant’s name on it at her father’s house, he informed them of where
she was staying.  The officials found
applicant on March 19, 2011, the day after her scheduled return flight to the
United States.

          On
cross-examination, Officer Helton acknowledged that the Harris County District
Attorney’s Office did not file charges against applicant until after she had left
for Nigeria.  He further stated that the
charges that had been filed were dropped after applicant returned to the
country.

          The
State called Lieutenant K. Herring, with the Harris County Fire Marshal’s
Office, who testified that she investigated an incident at a Katy high school
in 2002 involving two fires set in two different restrooms.  Lieutenant Herring testified that video
recordings demonstrated applicant leaving the restroom at the time of the fires
and that, after she was confronted, applicant eventually admitted that she had
started the fires.  Applicant pleaded
nolo contendere to the second degree felony offense of arson, was placed on
probation, and ultimately completed the “Juvenile Fire Stoppers Program.”  Lieutenant Herring also testified that applicant
had five additional disciplinary incidents while she was a student in the Katy
Independent School District:  applicant
had been reprimanded twice for theft and once each for trespassing, disruptive activity,
and assault.

          The
State also called Kristi Smith, who works in the child care licensing division
of the Department of Family and Protective Services.  She testified that she visited the scene of
the fire while the fire department and applicant were still present.  Smith testified that she spoke to applicant,
who seemed “pretty calm” and “not nervous.” 
She also testified that applicant told her that she had been cooking oil
on the stove and was in the restroom when the fire started.  Smith tried to speak to applicant’s family
members, and she testified that applicant’s mother stated that she “didn’t have
any comments” and that applicant’s brother questioned whether it was necessary
for Smith to speak to applicant about the incident.

          Smith
also spoke with applicant after she returned to the United States.  Applicant told her that “it was not a big
deal” if the parents of the children at her day care did not pay their fees on
time because “[applicant] had inheritance.” 
Smith asked applicant how often she visited Nigeria, and applicant
responded that she “would go approximately two to three times a year or
whenever there was a family occasion.”  She
also informed Smith that she paid for her ticket to Nigeria herself.

          Applicant
did not testify on her own behalf at the bail reduction hearing.  Applicant’s brother, Ronald Tata, testified
regarding applicant’s decision to go to Nigeria, her financial circumstances,
and their family’s financial circumstances and relative incomes.  According to Ron, applicant went to Nigeria
against the advice of their mother, who told applicant that leaving the United
States would “look really, really bad.”  He
stated that he drove applicant to Dallas and lent her approximately $800 for a
plane ticket to Nigeria.  He stated that
no charges were pending against her at that time.  He further testified that he never believed
that she would go to Nigeria and not eventually come back to Houston.  According to Ron, he and his family members
frequently visit Nigeria, and he agreed that he has “a lot of family members in
Nigeria” and that most of his extended family lives in Nigeria.  Ron also testified that he spoke with applicant
after she was in custody in Nigeria, and she told him that she had turned
herself in and that she would be returning to the United States “in a couple of
days.”[3]  He stated that she waived extradition
proceedings back to the United States.

Ron testified that applicant, who
is twenty-three, had been involved in babysitting and child care in their
community and through her church since she was approximately eight or nine years
old.  Ron stated that applicant leased
the building in which the day care was located. 
He also testified that he had been given power of attorney over
applicant’s finances, and he stated that she does not own any stocks, bonds, or
real estate, and she also does not have any inheritance money.  He testified that applicant currently has $46
in her checking account, she has no source of income beyond the day-care
center, and she does not have a savings account.  He stated that applicant could not make a
$1.1 million bond.

Ron testified that everyone in his
family, except for his father, who is a permanent resident but currently lives
in Nigeria, is a United States citizen.  He
testified that his mother and younger sister, both of whom are nurses, make
approximately $150,000 and $55,000 per year, respectively.  Ron, who is a real estate agent, testified
that he makes $45,000 per year.  He
testified that he did not know what his father’s income is, although he does
know that his father owns companies that are involved with building and leasing
condos in Nigeria.  He estimated that his
father owns approximately thirty acres of property in Nigeria, but he also
testified that he did not know the value of this property and he doubted if it
could be used as security for a bond because “a lot of it is undeveloped.”  Ron testified that if applicant were released
on bond, his family “would take her in” and make sure that she would comply
with any conditions, such as requirements that she surrender her passports and
submit to electronic monitoring.  He also
stated that, although he would not be “very much help” to applicant
financially, he would “feel very comfortable signing a bond for her.”

Ron further testified that his
parents own a house in Katy and have lived there for over ten years.  The trial court admitted Harris County
Appraisal District records demonstrating that this house, as of January 1,
2011, had an appraised value of $408,860. 
Ron did not testify regarding the amount of a bond that he and his
family could make for applicant, nor did he testify regarding their financial
resources beyond their annual incomes.

The trial court denied habeas
corpus relief, and this appeal pursuant to Texas Rule of Appellate Procedure 31
followed.  See Tex. R. App. P.
31 (providing for appellate review of orders in bail proceedings).

Standard of Review

          We
review a trial court’s decision regarding bail settings for an abuse of
discretion.  See Ex parte Rubac, 611 S.W.2d 848, 849 (Tex. Crim. App. 1981); Montalvo v. State, 315 S.W.3d 588, 592
(Tex. App.—Houston [1st Dist.] 2010, no pet.).  When reviewing a trial court’s decision, we
will not disturb that ruling as long as it is “at least within the zone of
reasonable disagreement.”  Cooley v. State, 232 S.W.3d 228, 234
(Tex. App.—Houston [1st Dist.] 2007, no pet.). 
“But an abuse of discretion review requires more of the appellate court
than simply deciding that the trial court did not rule arbitrarily or
capriciously.  The appellate court must
instead measure the trial court’s ruling against the relevant criteria by which
the ruling was made.”  Id.

In exercising its discretion, the
trial court should consider the following statutory rules in setting a
defendant’s bail:

1.             
The bail shall be sufficiently high to give reasonable assurance     that the undertaking will be complied with.

 

2.             
The power to require bail is not to be used as an instrument of       oppression.

 

3.             
The nature of the offense and the circumstances under which it        was committed are to be considered.

 

4.             
The ability to make bail is to be regarded, and proof may be           taken upon this point.

 

5.             
The future safety of the victim of the alleged offense and the           community shall be considered.

 

Tex. Code Crim. Proc. Ann. art. 17.15
(Vernon 2005); Golden v. State, 288
S.W.3d 516, 518 (Tex. App.—Houston [1st Dist.] 2009, pet. ref’d); Milner v. State, 263 S.W.3d 146, 147–48
(Tex. App.—Houston [1st Dist.] 2006, no pet.). 
The burden of proof is upon the defendant to demonstrate that the set
bail amount is excessive.  Golden, 288 S.W.3d at 518.

Analysis

          The
primary purpose for setting bail is to secure the presence of the defendant at
trial.  Montalvo, 315 S.W.3d at 593. 
The trial court should set the bail amount sufficiently high to give
reasonable assurance that the accused will comply with the undertaking, but not
so high as to be an instrument of oppression. 
Id.; Golden, 288 S.W.3d at 519. 
In addition to the statutory factors listed in article 17.15, we also
consider the defendant’s work record, family ties, length of residency, past
criminal record, conformity with previous bond conditions, other outstanding
bonds, and aggravating factors involved in the offense.[4]  Golden,
288 S.W.3d at 519 (citing Rubac, 611
S.W.2d at 849–50); Milner, 263 S.W.3d
at 148.

A.  
Nature of the Offenses

The defendant’s potential sentence
and the nature of the crime are “primary factors” for us to consider.  Ex
parte Hunt, 138 S.W.3d 503, 506 (Tex. App.—Fort Worth 2004, pet. ref’d); see also Montalvo, 315 S.W.3d at 593
(noting that consideration of nature and circumstances of offense requires us
to consider range of punishment permitted in event of conviction).  When the nature of the offense is serious and
aggravating factors are involved, “a lengthy prison sentence following trial is
probable.”  Ex parte Scott, 122 S.W.3d 866, 869 (Tex. App.—Fort Worth 2003, no
pet.).  “Pretrial bond in these kind of
cases should be set sufficiently high to secure the presence of the accused at
trial because the accused’s reaction to the prospect of a lengthy prison sentence
might be not to appear.”  Ex parte Hulin, 31 S.W.3d 754, 761 (Tex.
App.—Houston [1st Dist.] 2000, no pet.); Hunt,
138 S.W.3d at 506 (“Given the serious nature of the offenses and the potential
for a lengthy sentence, the trial court could properly have concluded that the
amounts of the bonds were reasonable.”).

Here, the State has charged
applicant with four counts of felony murder, a first degree felony, which
carries a punishment range of confinement for five to ninety-nine years, or
life, plus a fine of up to $10,000.  See Tex.
Penal Code Ann. § 19.02(b)(3), (c) (Vernon 2011) (classifying
felony murder as first degree felony); see
also id. § 12.32 (Vernon 2011) (stating punishment range for first
degree felony).  If convicted of felony
murder, therefore, applicant faces potential life imprisonment.  The State has also charged applicant with
three counts of abandoning a child and two counts of reckless injury to a
child, both of which are second degree felonies and carry a punishment range of
confinement for two to twenty years, plus up to a $10,000 fine.  See
id. § 22.04(a)(1), (e) (Vernon
Supp. 2011) (classifying reckless injury to child as second degree felony), § 22.041(b),
(e) (Vernon 2011) (classifying abandonment of child as second degree felony); see also id. § 12.33 (Vernon 2011)
(stating punishment range for second degree felony).  Abandonment of a child is not a “3g offense,”
and, thus, if convicted, applicant could potentially receive judge-ordered community
supervision.[5]  See Tex. Code Crim. Proc. Ann. art. 42.12,
sec. 3g(a)(1) (Vernon Supp. 2011).

Applicant argues that “the
circumstances of the alleged offenses suggest—in the worst case scenario—negligent or reckless and perhaps immature actions with no intent of harm
to another” and contends that this supports a reduced bail amount.  In support of this contention, applicant
points to evidence introduced at the bail hearing that, when she arrived back
at the day care, she successfully saved two of the children from the burning house
and that she was distraught and in shock after the incident.  The State, meanwhile, produced evidence that
applicant deliberately left seven children alone in the house while the stove
remained on with cooking oil heating on top of it, while she spent nearly
thirty minutes driving to and from and shopping at a nearby Target store.  As a result of the fire, four young children
died and two others were seriously injured.

Given the serious nature of
applicant’s offenses and the potential for a lengthy sentence if convicted, the
trial court could have properly concluded that applicant’s bond was reasonable.[6]  See
Milner, 263 S.W.3d at 149; Scott,
122 S.W.3d at 870.

B.  
Sufficient Bail to Assure Appearance
but Not Oppress

A trial court should set bail
sufficiently high to provide reasonable assurance that the defendant will
appear at trial.  Montalvo, 315 S.W.3d at 593. 
“A defendant’s ties to the community and work history bear on the
adequacy of bail to give reasonable assurance [she] will appear.”  Richardson
v. State, 181 S.W.3d 756, 759 (Tex. App.—Waco 2005, no pet.).  We also consider whether the record reflects
that the trial court made its decision regarding the bail amount “for the
purpose of forcing [the defendant] to remain incarcerated pending trial.”  Milner,
263 S.W.3d at 149 (citing Ex parte Harris,
733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no pet.) (trial judge stated, “I’d
rather see him in jail than to see someone’s life
taken . . . .”)).  The record here contains no
indication that the trial court set the bail amounts for the sole purpose of
ensuring that applicant remains incarcerated pending trial.  See
Montalvo, 315 S.W.3d at 596 (“Our independent review of the habeas corpus
record likewise does not suggest that the trial court deliberately set bail at
an excessively high level solely to prevent Montalvo from posting bail.”).

Applicant presented evidence at the
bail reduction hearing that she grew up in Katy and her family has lived in the
area for at least the past ten years. 
Although applicant’s father currently lives and works in Nigeria,
applicant, one of her brothers, one of her sisters, and her mother all live and
work in the greater-Houston area. 
Applicant’s brother, Ron, testified that his family “would take
[applicant] in” if she were released on bail pending trial.  Although applicant’s place of business was
destroyed in the fire that formed the basis for these offenses, and, thus, she
does not currently have a job to return to if released, Ron testified that
applicant had been consistently involved in babysitting and child care in her
community and through her church since she was “eight or nine” years old, and
she therefore has a favorable work history. 
Thus, applicant presented evidence of family and community ties to the
area, which weighs in favor of a reduction of the bail amount.

C.  
Ability to Make Bail

Generally, to show that she cannot
make bail, a defendant must demonstrate that her funds and her family’s funds
have been exhausted.  Milner, 263 S.W.3d at 149.  Unless she has shown that her funds and those
of her family have been exhausted, a defendant must usually show that she made
an unsuccessful effort to furnish bail before bail can be determined to be
excessive.  Id.  If, however, both the
defendant and her family indicate a financial inability to procure a bond, the
court will not require her “to do a useless thing.”  Id.
at 149–50 (quoting Ex parte Dueitt,
529 S.W.2d 531, 532–33 (Tex. Crim. App. 1975)).

“[T]he ability of an accused to
make bail does not itself control the amount of bail, even if the accused is
indigent.”  Wright v. State, 976 S.W.2d 815, 820 (Tex. App.—Houston [1st Dist.]
1998, no pet.).  If the defendant’s
ability to make bond in a specific amount controlled, “the role of the trial
court in setting bond would be completely eliminated and the accused would be
in the position to determine what his bond should be.”  Milner,
263 S.W.3d at 150.  When considering an
applicant’s ability to make bail, we are not limited to looking solely to the
defendant’s financial resources; rather, we may also consider her family’s
resources and ability to post security.  See id. (considering, in addition to
defendant’s financial resources, those of defendant’s mother); see also Montalvo, 315 S.W.3d at 595
(“No evidence was presented about any discussions with bondsmen or the maximum
amount of bail that Montalvo believed he could satisfy.  Similarly, no evidence was presented about
whether Montalvo’s family had any ability to help him make bail.”).

Here, Ron, who has power of
attorney over applicant’s finances, testified that applicant does not own any
stocks, bonds, or real estate.  She also
does not have a savings account, and the current balance of her checking
account is $46.  Ron stated that
applicant has no source of income beyond the day-care center, which is no
longer operational, and, thus, applicant could not make a $1.1 million dollar
bond.

Ron also testified that his annual
income is $45,000, and that his mother’s and his sister’s annual incomes are
$150,000 and $55,000, respectively.  He
further testified that he was unaware of his father’s income, although he did
know that his father owned several companies involved in condo development in
Nigeria and that his father owned property in Nigeria.  Ron was unaware of the value of this
property, but he expressed doubt that the property could be used as collateral for
a bond because “a lot of it is undeveloped.” 
The trial court admitted tax records from the Harris County Appraisal
District, which reflected that applicant’s parent’s property in Katy was
appraised at $408,860 as of January 1, 2011. 
Ron also stated that he did not believe that he himself could be “very much
help” to applicant in a financial sense, but he would “feel very comfortable
signing a bond for her.”  Ron provided no
testimony regarding his family’s attempts to procure a bond for applicant, and
he did not testify regarding how much he and his family could contribute to
obtaining a bond for applicant.[7]

Although applicant made no effort
to demonstrate that she herself was unable to obtain a bond, she presented
evidence that she lacks the financial resources to make bail.  See
Milner, 263 S.W.3d at 150.  Applicant
presented limited testimony regarding her family’s financial resources, and she
produced no evidence regarding whether an “attempt had been made to determine
whether [applicant] could obtain a bond on the basis of [her] family’s
resources.”  Id.  As a result, “the trial
court could have determined that the evidence supports maintaining the present
bail amount.”  Id.  We note, however, that
even if applicant had demonstrated that neither she nor her family has the
financial ability to obtain a bond, “this element would not control over all
other considerations.”  Id.

D.  
Future Safety of Victim and Community

Article 17.15 requires that we also
consider “[t]he future safety of a victim of the alleged offenses and the
community” in reviewing the trial court’s bail determination.  Tex.
Code Crim. Proc. Ann. art. 17.15(5); Milner,
263 S.W.3d at 150.  There was no evidence
introduced at the bail reduction hearing that applicant poses a further danger
to the surviving victims or to the community if she is released on bail pending
trial.  Thus, this factor weighs in favor
of a reduction of applicant’s bail amount.

E.  
Other Factors

The State presented evidence that
applicant had a juvenile adjudication for arson in 2003, when she was fourteen
years old, and that she had successfully completed probation for the
offense.  Aside from this offense and
disciplinary problems throughout middle and high school, applicant has no
further criminal history, and there is no evidence that she has failed to
comply with previous bond or probation conditions.

Applicant acknowledged that, after
the incident occurred but before any charges had been filed, she left the
United States and traveled to Nigeria. 
Ron testified that he and his family members frequently travel to Nigeria,
that he has “a lot” of family members in Nigeria, and that most of his extended
family lives in Nigeria.  The State
presented evidence that applicant’s family in the United States and her father
in Nigeria were not forthcoming with information regarding applicant’s
whereabouts, although her father ultimately informed Interpol and the Nigerian
authorities of where applicant was staying after he was confronted with an
airline ticket in applicant’s name that was found in his house.  The parties presented conflicting evidence
regarding whether applicant was apprehended or whether she voluntarily turned
herself in to authorities, but it is undisputed that she waived extradition
proceedings.  See Hulin, 31 S.W.3d at 761 (considering fact that defendant waived
extradition proceedings as factor weighing in favor of reducing bond); see also Montalvo, 315 S.W.3d at 595
(“We acknowledge Montalvo’s voluntary surrender as a factor favoring a
reduction of bail.”).

The State also presented evidence that applicant’s family has
not been helpful throughout the course of the proceedings, from restricting
access to applicant when arson investigators attempted to obtain a statement from
her after the fire to failing to provide information regarding applicant’s
location in Nigeria.  Although Ron
testified that his family would ensure that applicant complied with any bond
conditions if she were released, the trial court could have chosen to
disbelieve this testimony given applicant’s family’s documented
uncooperativeness during the pendency of this case thus far.  See
Esquivel v. State, 922 S.W.2d 601, 604 (Tex. App.—San Antonio 1996, no
pet.) (noting that, as fact-finder at bail reduction hearing, trial court has
sole duty of judging credibility of witnesses and determining weight to give
their testimony); see also Ex parte
Parker, 26 S.W.3d 711, 712–13 (Tex. App.—Waco 2000, no pet.) (refusing to
reduce bail and noting that, “Parker fled to Louisiana when he became aware of
the allegations against him and after he agreed to take a polygraph
examination.  Parker’s mother declined to
help investigators locate him”).

Applicant presented evidence (1) that she lacks the financial
resources to make bail at the amount currently set, (2) that she has family in
the Houston area and ties to the community, (3) that she has no adult criminal
record, (4) that she is not a danger to the victims or the community, and (5)
that she will live with her family members, who will ensure that she complies
with any bail conditions, if released. 
All of these factors weigh in favor of a reduction of her bond amount.

The record also includes evidence, however, that applicant is
charged with nine offenses, four of which carry the possibility of life
imprisonment if applicant is convicted.  The
bond amounts set by the trial court for each particular offense are within the
ranges that this Court has previously upheld as not excessive.  Furthermore, applicant presented no evidence
regarding what bail amount her family can afford, and, although her brother
testified that he and his family would ensure that applicant complies with any
bond conditions, the State presented substantial evidence that applicant’s
family had been uncooperative throughout the authorities’ attempts to speak
with applicant and to locate her in Nigeria. 
There is also evidence in the record that applicant has strong family
ties to Nigeria, where she traveled immediately after the incident.  The State presented evidence that her father
and other friends and family members attempted to shield her from Interpol and
Nigerian authorities before finally revealing her location.  The trial court could have reasonably
concluded that applicant constitutes a significant flight risk.

Based on this record, therefore, we cannot conclude that the
bail amounts set by the trial court are constitutionally or statutorily
excessive.  We therefore hold that the
trial court did not abuse its discretion in setting applicant’s bail at a total
of $1.1 million for the nine charged offenses.

We overrule applicant’s first, second, and third issues.

Conclusion

          We
affirm the judgment of the trial court.

 

 

                                                                      Evelyn
V. Keyes

                                                                      Justice


 

Panel
consists of Justices Keyes, Higley, and Massengale.

Publish.  Tex.
R. App. P. 47.2(b).











[1]
        See Tex. Penal Code Ann.
§ 19.02(b)(3) (Vernon 2011) (felony murder), § 22.04(a)(1) (Vernon
Supp. 2011) (reckless injury to child), § 22.041(b) (Vernon 2011)
(abandoning a child).





[2]
        One of applicant’s witnesses at
the bail reduction hearing was Christian Wendenburg, who was a neighbor of the
day-care center.  Wendenburg drove up to
the scene at approximately 1:30 p.m. and saw applicant standing in the street
and flagging him down as he approached. 
He testified that he saw applicant run into the burning house and bring
two small children outside.  He stated
that applicant was “very frantic,” “very vocal,” and “very upset” throughout
the incident.  Applicant’s brother, Ron
Tata, agreed and testified that when he arrived at the scene, applicant was
shaking and in tears, her hands and arms were bleeding, her voice was “real
cracky,” and she was “coughing a lot.”





[3]
        On cross-examination, Ron
testified that no one in his family communicated with applicant while she was
in Nigeria, although he did contact his father and inform him that charges had
been filed against applicant.





[4]
        Although applicant asserts in
three distinct issues that the bail amount set by the trial court violates the
Eighth Amendment of the United States Constitution, Article I, Sections 10, 11,
and 13 of the Texas Constitution, and Code of Criminal Procedure articles 1.07
and 1.09, she does not provide separate arguments and authorities for each
issue, and she gives no indication that the trial court’s bail decision should
be analyzed differently for each issue. 
We therefore consider applicant’s three issues together.





[5]
        Although reckless injury to a
child is not a “3g offense,” and thus community supervision would generally be
available, the indictments for these offenses allege that applicant used or
exhibited a deadly weapon, fire, during the commission of the offenses.  As a result, if the fact finder finds
applicant guilty of these offenses as charged in the indictments, she would not
be eligible for community supervision pursuant to Code of Criminal Procedure
article 42.12, section 3g(a)(2), which provides that judge-ordered community
supervision does not apply “to a defendant when it is shown that a deadly
weapon . . . was used or exhibited during the commission of
a felony offense . . . .” 
Tex. Code Crim. Proc. Ann.
art. 42.12, sec. 3g(a)(2) (Vernon Supp. 2011).





[6]
        We note that this Court has
previously approved bail amounts ranging from $100,000 to $600,000 for first
degree felony offenses and amounts ranging from $30,000 to $75,000 for second
degree felony offenses.  See Montalvo v. State, 315 S.W.3d 588,
596 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (upholding bail of $100,000
for murder charge); Milner v. State,
263 S.W.3d 146, 151 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (upholding
total bail of $500,000 for murder and attempted murder charges); Cooley v. State, 232 S.W.3d 228, 238
(Tex. App.—Houston [1st Dist.] 2007, no pet.) (upholding total bail of $750,000
for three solicitation of murder charges); Ex
parte Ruiz, 129 S.W.3d 751, 755 (Tex. App.—Houston [1st Dist.] 2004, no
pet.) (upholding $600,000 bail for first-degree possession of controlled
substance); Ex parte Sabur-Smith, 73
S.W.3d 436, 441 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (reducing bail to
$30,000 in second-degree sexual assault case); Golden v. State, 288 S.W.3d 516, 521 (Tex. App.—Houston [1st Dist.]
2009, pet. ref’d) (reducing bail to $75,000 in second-degree possession of
controlled substance case).  Here,
applicant is charged with four first degree felonies, with bail set at $200,000
for each count, and five second degree felonies, with bail set at $75,000 for
the three abandoning a child offenses and at $50,000 for the two reckless
injury offenses.  These amounts fall
within the range of bail amounts that we have previously approved.





[7]
        This Court has previously taken
“judicial notice that in order to obtain a bond . . . a
defendant must usually pay the bondsman at least 10 percent of the bail amount,
and, in addition, furnish substantial collateral, often in an amount equal to
or exceeding the amount of bail.”  Sabur-Smith, 73 S.W.3d at 440.