**Ex parte Jessica TATA, Applicant.**

**No. 01–11–00601–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 8, 2011.

Mike DeGeurin, Houston, TX, for Appellant.

Alan Curry, Chief Prosecutor, Appellate Division, Patricia R. Lykos, Harris County District Attorney's Office, Houston, TX, for State.

Panel consists of Justices KEYES, HIGLEY, and MASSENGALE.

## OPINION

EVELYN V. KEYES, Justice.

Applicant, Jessica Tata, is charged with nine offenses: four counts of felony murder, two counts of reckless injury to a child, and three counts of abandoning a child.[1] The trial court set bail at $50,000 for each of the abandoning a child charges, $75,000 for each of the reckless injury charges, and $200,000 for each of the felony murder charges, for a cumulative bail amount of $1,100,000. Applicant filed an application for a writ of habeas corpus and bond reduction, which the trial court denied. In three issues on appeal, applicant contends that the bond amounts set by the trial court are excessive pursuant to the Eighth Amendment of the United States Constitution, Article I, Sections 10, 11, and 13 of the Texas Constitution, and articles 1.07 and 1.09 of the Texas Code of Criminal Procedure.

We affirm.

## Background

At applicant's bail reduction hearing, Houston Fire Department Investigator D. Green testified that he investigated a fire that occurred on February 24, 2011, at a home day-care center operated by applicant. For the purposes of this hearing, the parties stipulated that, as a result of this fire, four young children died and three other children were injured, two of them seriously. Investigator Green testified that the fire started on the stovetop and that the cause of the fire was "cooking oil in a pan on the stovetop." He further testified that, although applicant had made a statement that she was in the restroom at the time the fire started, he observed applicant at the scene and did not notice any physical evidence, such as soot on her clothing or any injuries, that indicated she had been inside the house. He stated that he later viewed a surveillance video from a Target store, located approximately three minutes from the day care, that depicted applicant shopping at the Target at the time the fire started.

Applicant was taken to the hospital and Investigator Green attempted to speak with her and obtain a statement. He char-

---

1. *See* Tex. Penal Code Ann. § 19.02(b)(3) (Vernon 2011) (felony murder), § 22.04(a)(1) (Vernon Supp.2011) (reckless injury to child), § 22.041(b) (Vernon 2011) (abandoning a child).

acterized her family's attitude as "uncooperative," and testified that her brother "felt like [Green] was harassing [applicant] just to get a statement." When Green spoke to applicant, "she stated that she was in shock and ... she didn't know why she was in the hospital and she didn't know what [Green] was talking about." Based on his experience as an E.M.T., Green did not believe that applicant was in shock, and he testified that he believed she "was being deceptive." The trial court admitted an audio recording of Investigator Green's conversation with applicant at the hospital, which included Green's statement that he would "be contacting [applicant] at a later date." Green returned early the next morning to speak with applicant before she was discharged from the hospital, but he could only speak with applicant's sister and applicant's friend, who informed Green that they were taking applicant to the friend's house.

Later the next day, two fellow officers attempted to obtain a statement from applicant, but she informed the officers that she wished to speak with her attorney before she gave a statement. The officers did not have a chance to obtain a statement because they "[wound] up getting a tip that [applicant] was leaving the country." Investigator Green went to applicant's family's house to speak with her family members, but he "was never able to talk to anyone when [he] went there."

On cross-examination, the trial court admitted the audio recording of applicant's 9–1–1 call, and Investigator Green acknowledged that a witness to the fire had said that he observed applicant bringing two children out of the burning house.[2] Green stated that when he spoke to applicant, he was not trying to "pin the blame" on her but was merely "trying to get some answers" about the fire and the surrounding circumstances.

Houston Police Department Officer C. Helton, who is assigned to the Gulf Coast Violent Offenders Task Force division of the U.S. Marshals, also testified at the hearing regarding his role in the search for applicant after she left the country. Officer Helton testified that applicant flew to Lagos, Nigeria, on February 26, 2011, two days after the fire. He also testified that applicant had booked a return flight to Dallas for March 18, 2011. He stated that applicant left the country on an "international passport."

Officer Helton testified that he spoke with applicant's mother and sister and that they did not provide any information that assisted officials in locating applicant in Nigeria. He stated that he learned, from speaking to the family, that they have friends and family in Nigeria and that they make annual trips to Nigeria. Officer Helton testified that applicant was ultimately found in Port Harcourt, Nigeria, and that she did not turn herself in to the authorities. He stated that Interpol and Nigerian officials had spoken with applicant's father, who lives and works in Nigeria, and he informed the officials that he had not spoken to applicant. When the officials discovered an airline ticket with applicant's name on it at her father's house, he informed them of where she was staying.

---

2. One of applicant's witnesses at the bail reduction hearing was Christian Wendenburg, who was a neighbor of the day-care center. Wendenburg drove up to the scene at approximately 1:30 p.m. and saw applicant standing in the street and flagging him down as he approached. He testified that he saw applicant run into the burning house and bring two small children outside. He stated that applicant was "very frantic," "very vocal," and "very upset" throughout the incident. Applicant's brother, Ron Tata, agreed and testified that when he arrived at the scene, applicant was shaking and in tears, her hands and arms were bleeding, her voice was "real cracky," and she was "coughing a lot."

The officials found applicant on March 19, 2011, the day after her scheduled return flight to the United States.

On cross-examination, Officer Helton acknowledged that the Harris County District Attorney's Office did not file charges against applicant until after she had left for Nigeria. He further stated that the charges that had been filed were dropped after applicant returned to the country.

The State called Lieutenant K. Herring, with the Harris County Fire Marshal's Office, who testified that she investigated an incident at a Katy high school in 2002 involving two fires set in two different restrooms. Lieutenant Herring testified that video recordings demonstrated applicant leaving the restroom at the time of the fires and that, after she was confronted, applicant eventually admitted that she had started the fires. Applicant pleaded nolo contendere to the second degree felony offense of arson, was placed on probation, and ultimately completed the "Juvenile Fire Stoppers Program." Lieutenant Herring also testified that applicant had five additional disciplinary incidents while she was a student in the Katy Independent School District: applicant had been reprimanded twice for theft and once each for trespassing, disruptive activity, and assault.

The State also called Kristi Smith, who works in the child care licensing division of the Department of Family and Protective Services. She testified that she visited the scene of the fire while the fire department and applicant were still present. Smith testified that she spoke to applicant, who seemed "pretty calm" and "not nervous." She also testified that applicant told her that she had been cooking oil on the stove and was in the restroom when the fire started. Smith tried to speak to applicant's family members, and she testified that applicant's mother stated that she "didn't have any comments" and that applicant's brother questioned whether it was necessary for Smith to speak to applicant about the incident.

Smith also spoke with applicant after she returned to the United States. Applicant told her that "it was not a big deal" if the parents of the children at her day care did not pay their fees on time because "[applicant] had inheritance." Smith asked applicant how often she visited Nigeria, and applicant responded that she "would go approximately two to three times a year or whenever there was a family occasion." She also informed Smith that she paid for her ticket to Nigeria herself.

Applicant did not testify on her own behalf at the bail reduction hearing. Applicant's brother, Ronald Tata, testified regarding applicant's decision to go to Nigeria, her financial circumstances, and their family's financial circumstances and relative incomes. According to Ron, applicant went to Nigeria against the advice of their mother, who told applicant that leaving the United States would "look really, really bad." He stated that he drove applicant to Dallas and lent her approximately $800 for a plane ticket to Nigeria. He stated that no charges were pending against her at that time. He further testified that he never believed that she would go to Nigeria and not eventually come back to Houston. According to Ron, he and his family members frequently visit Nigeria, and he agreed that he has "a lot of family members in Nigeria" and that most of his extended family lives in Nigeria. Ron also testified that he spoke with applicant after she was in custody in Nigeria, and she told him that she had turned herself in and that she would be returning to the United

States "in a couple of days."[3] He stated that she waived extradition proceedings back to the United States.

Ron testified that applicant, who is twenty-three, had been involved in babysitting and child care in their community and through her church since she was approximately eight or nine years old. Ron stated that applicant leased the building in which the day care was located. He also testified that he had been given power of attorney over applicant's finances, and he stated that she does not own any stocks, bonds, or real estate, and she also does not have any inheritance money. He testified that applicant currently has $46 in her checking account, she has no source of income beyond the day-care center, and she does not have a savings account. He stated that applicant could not make a $1.1 million bond.

Ron testified that everyone in his family, except for his father, who is a permanent resident but currently lives in Nigeria, is a United States citizen. He testified that his mother and younger sister, both of whom are nurses, make approximately $150,000 and $55,000 per year, respectively. Ron, who is a real estate agent, testified that he makes $45,000 per year. He testified that he did not know what his father's income is, although he does know that his father owns companies that are involved with building and leasing condos in Nigeria. He estimated that his father owns approximately thirty acres of property in Nigeria, but he also testified that he did not know the value of this property and he doubted if it could be used as security for a bond because "a lot of it is undeveloped." Ron testified that if applicant were released on bond, his family "would take her in" and make sure that

she would comply with any conditions, such as requirements that she surrender her passports and submit to electronic monitoring. He also stated that, although he would not be "very much help" to applicant financially, he would "feel very comfortable signing a bond for her."

Ron further testified that his parents own a house in Katy and have lived there for over ten years. The trial court admitted Harris County Appraisal District records demonstrating that this house, as of January 1, 2011, had an appraised value of $408,860. Ron did not testify regarding the amount of a bond that he and his family could make for applicant, nor did he testify regarding their financial resources beyond their annual incomes.

The trial court denied habeas corpus relief, and this appeal pursuant to Texas Rule of Appellate Procedure 31 followed. *See* TEX.R.APP. P. 31 (providing for appellate review of orders in bail proceedings).

### Standard of Review

■■■ We review a trial court's decision regarding bail settings for an abuse of discretion. *See Ex parte Rubac,* 611 S.W.2d 848, 849 (Tex.Crim.App.1981); *Montalvo v. State,* 315 S.W.3d 588, 592 (Tex.App.-Houston [1st Dist.] 2010, no pet.). When reviewing a trial court's decision, we will not disturb that ruling as long as it is "at least within the zone of reasonable disagreement." *Cooley v. State,* 232 S.W.3d 228, 234 (Tex.App.-Houston [1st Dist.] 2007, no pet.). "But an abuse of discretion review requires more of the appellate court than simply deciding that the trial court did not rule arbitrarily or capriciously. The appellate court must instead measure the trial court's ruling against the

---

3. On cross-examination, Ron testified that no one in his family communicated with applicant while she was in Nigeria, although he did contact his father and inform him that charges had been filed against applicant.

relevant criteria by which the ruling was made." *Id.*

■ In exercising its discretion, the trial court should consider the following statutory rules in setting a defendant's bail:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
2. The power to require bail is not to be used as an instrument of oppression.
3. The nature of the offense and the circumstances under which it was committed are to be considered.
4. The ability to make bail is to be regarded, and proof may be taken upon this point.
5. The future safety of the victim of the alleged offense and the community shall be considered.

TEX.CODE CRIM. PROC. ANN. art. 17.15 (Vernon 2005); *Golden v. State,* 288 S.W.3d 516, 518 (Tex.App.-Houston [1st Dist.] 2009, pet. ref'd); *Milner v. State,* 263 S.W.3d 146, 147–48 (Tex.App.-Houston [1st Dist.] 2006, no pet.). The burden of proof is upon the defendant to demonstrate that the set bail amount is excessive. *Golden,* 288 S.W.3d at 518.

### Analysis

■ The primary purpose for setting bail is to secure the presence of the defendant at trial. *Montalvo,* 315 S.W.3d at 593. The trial court should set the bail amount sufficiently high to give reasonable assurance that the accused will comply with the undertaking, but not so high as to be an instrument of oppression. *Id.; Golden,* 288 S.W.3d at 519. In addition to the statutory factors listed in article 17.15, we also consider the defendant's work record, family ties, length of residency, past criminal record, conformity with previous bond conditions, other outstanding bonds, and aggravating factors involved in the offense.[4] *Golden,* 288 S.W.3d at 519 (citing *Rubac,* 611 S.W.2d at 849–50); *Milner,* 263 S.W.3d at 148.

### A. Nature of the Offenses

■ The defendant's potential sentence and the nature of the crime are "primary factors" for us to consider. *Ex parte Hunt,* 138 S.W.3d 503, 506 (Tex. App.-Fort Worth 2004, pet. ref'd); *see also Montalvo,* 315 S.W.3d at 593 (noting that consideration of nature and circumstances of offense requires us to consider range of punishment permitted in event of conviction). When the nature of the offense is serious and aggravating factors are involved, "a lengthy prison sentence following trial is probable." *Ex parte Scott,* 122 S.W.3d 866, 869 (Tex.App.-Fort Worth 2003, no pet.). "Pretrial bond in these kind of cases should be set sufficiently high to secure the presence of the accused at trial because the accused's reaction to the prospect of a lengthy prison sentence might be not to appear." *Ex parte Hulin,* 31 S.W.3d 754, 761 (Tex.App.-Houston [1st Dist.] 2000, no pet.); *Hunt,* 138 S.W.3d at 506 ("Given the serious nature of the offenses and the potential for a lengthy sentence, the trial court could properly have concluded that the amounts of the bonds were reasonable.").

Here, the State has charged applicant with four counts of felony murder, a first

---

4. Although applicant asserts in three distinct issues that the bail amount set by the trial court violates the Eighth Amendment of the United States Constitution, Article I, Sections 10, 11, and 13 of the Texas Constitution, and Code of Criminal Procedure articles 1.07 and 1.09, she does not provide separate arguments and authorities for each issue, and she gives no indication that the trial court's bail decision should be analyzed differently for each issue. We therefore consider applicant's three issues together.

degree felony, which carries a punishment range of confinement for five to ninety-nine years, or life, plus a fine of up to $10,000. *See* Tex. Penal Code Ann. § 19.02(b)(3), (c) (Vernon 2011) (classifying felony murder as first degree felony); *see also id.* § 12.32 (Vernon 2011) (stating punishment range for first degree felony). If convicted of felony murder, therefore, applicant faces potential life imprisonment. The State has also charged applicant with three counts of abandoning a child and two counts of reckless injury to a child, both of which are second degree felonies and carry a punishment range of confinement for two to twenty years, plus up to a $10,000 fine. *See id.* § 22.04(a)(1), (e) (Vernon Supp. 2011) (classifying reckless injury to child as second degree felony), § 22.041(b), (e) (Vernon 2011) (classifying abandonment of child as second degree felony); *see also id.* § 12.33 (Vernon 2011) (stating punishment range for second degree felony). Abandonment of a child is not a "3g offense," and, thus, if convicted, applicant could potentially receive judge-ordered community supervision.[5] *See* Tex.Code Crim. Proc. Ann. art. 42.12, sec. 3g(a)(1) (Vernon Supp. 2011).

Applicant argues that "the circumstances of the alleged offenses suggest—in the worst case scenario—negligent or reckless and perhaps immature actions with no intent of harm to another" and contends that this supports a reduced bail amount. In support of this contention, applicant points to evidence introduced at the bail hearing that, when she arrived back at the day care, she successfully saved two of the children from the burning house and that she was distraught and in shock after the incident. The State, meanwhile, produced evidence that applicant deliberately left seven children alone in the house while the stove remained on with cooking oil heating on top of it, while she spent nearly thirty minutes driving to and from and shopping at a nearby Target store. As a result of the fire, four young children died and two others were seriously injured.

Given the serious nature of applicant's offenses and the potential for a lengthy sentence if convicted, the trial court could have properly concluded that applicant's bond was reasonable.[6] *See Milner,* 263 S.W.3d at 149; *Scott,* 122 S.W.3d at 870.

---

5. Although reckless injury to a child is not a "3g offense," and thus community supervision would generally be available, the indictments for these offenses allege that applicant used or exhibited a deadly weapon, fire, during the commission of the offenses. As a result, if the fact finder finds applicant guilty of these offenses as charged in the indictments, she would not be eligible for community supervision pursuant to Code of Criminal Procedure article 42.12, section 3g(a)(2), which provides that judge-ordered community supervision does not apply "to a defendant when it is shown that a deadly weapon ... was used or exhibited during the commission of a felony offense...." Tex.Code Crim. Proc. Ann. art. 42.12, sec. 3g(a)(2) (Vernon Supp. 2011).

6. We note that this Court has previously approved bail amounts ranging from $100,000 to $600,000 for first degree felony offenses

and amounts ranging from $30,000 to $75,000 for second degree felony offenses. *See Montalvo v. State,* 315 S.W.3d 588, 596 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (upholding bail of $100,000 for murder charge); *Milner v. State,* 263 S.W.3d 146, 151 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (upholding total bail of $500,000 for murder and attempted murder charges); *Cooley v. State,* 232 S.W.3d 228, 238 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (upholding total bail of $750,000 for three solicitation of murder charges); *Ex parte Ruiz,* 129 S.W.3d 751, 755 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (upholding $600,000 bail for first-degree possession of controlled substance); *Ex parte Sabur–Smith,* 73 S.W.3d 436, 441 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (reducing bail to $30,000 in second-degree sexual assault case); *Golden v. State,* 288 S.W.3d 516, 521 (Tex.App.-Houston [1st Dist.] 2009, pet.

### B. Sufficient Bail to Assure Appearance but Not Oppress

A trial court should set bail sufficiently high to provide reasonable assurance that the defendant will appear at trial. *Montalvo*, 315 S.W.3d at 593. "A defendant's ties to the community and work history bear on the adequacy of bail to give reasonable assurance [she] will appear." *Richardson v. State*, 181 S.W.3d 756, 759 (Tex.App.-Waco 2005, no pet.). We also consider whether the record reflects that the trial court made its decision regarding the bail amount "for the purpose of forcing [the defendant] to remain incarcerated pending trial." *Milner*, 263 S.W.3d at 149 (citing *Ex parte Harris*, 733 S.W.2d 712, 714 (Tex.App.-Austin 1987, no pet.) (trial judge stated, "I'd rather see him in jail than to see someone's life taken . . . .")). The record here contains no indication that the trial court set the bail amounts for the sole purpose of ensuring that applicant remains incarcerated pending trial. *See Montalvo*, 315 S.W.3d at 596 ("Our independent review of the habeas corpus record likewise does not suggest that the trial court deliberately set bail at an excessively high level solely to prevent Montalvo from posting bail.").

Applicant presented evidence at the bail reduction hearing that she grew up in Katy and her family has lived in the area for at least the past ten years. Although applicant's father currently lives and works in Nigeria, applicant, one of her brothers, one of her sisters, and her mother all live and work in the greater-Houston area. Applicant's brother, Ron, testified that his family "would take [applicant] in" if she were released on bail pending trial.

Although applicant's place of business was destroyed in the fire that formed the basis for these offenses, and, thus, she does not currently have a job to return to if released, Ron testified that applicant had been consistently involved in babysitting and child care in her community and through her church since she was "eight or nine" years old, and she therefore has a favorable work history. Thus, applicant presented evidence of family and community ties to the area, which weighs in favor of a reduction of the bail amount.

### C. Ability to Make Bail

Generally, to show that she cannot make bail, a defendant must demonstrate that her funds and her family's funds have been exhausted. *Milner*, 263 S.W.3d at 149. Unless she has shown that her funds and those of her family have been exhausted, a defendant must usually show that she made an unsuccessful effort to furnish bail before bail can be determined to be excessive. *Id.* If, however, both the defendant and her family indicate a financial inability to procure a bond, the court will not require her "to do a useless thing." *Id.* at 149–50 (quoting *Ex parte Dueitt*, 529 S.W.2d 531, 532–33 (Tex.Crim. App.1975)).

"[T]he ability of an accused to make bail does not itself control the amount of bail, even if the accused is indigent." *Wright v. State*, 976 S.W.2d 815, 820 (Tex.App.-Houston [1st Dist.] 1998, no pet.). If the defendant's ability to make bond in a specific amount controlled, "the role of the trial court in setting bond would be completely eliminated and the accused would be in the position to determine what

ref'd) (reducing bail to $75,000 in second-degree possession of controlled substance case). Here, applicant is charged with four first degree felonies, with bail set at $200,000 for each count, and five second degree felo-

nies, with bail set at $75,000 for the three abandoning a child offenses and at $50,000 for the two reckless injury offenses. These amounts fall within the range of bail amounts that we have previously approved.

his bond should be." *Milner*, 263 S.W.3d at 150. When considering an applicant's ability to make bail, we are not limited to looking solely to the defendant's financial resources; rather, we may also consider her family's resources and ability to post security. *See id.* (considering, in addition to defendant's financial resources, those of defendant's mother); *see also Montalvo*, 315 S.W.3d at 595 ("No evidence was presented about any discussions with bondsmen or the maximum amount of bail that Montalvo believed he could satisfy. Similarly, no evidence was presented about whether Montalvo's family had any ability to help him make bail.").

Here, Ron, who has power of attorney over applicant's finances, testified that applicant does not own any stocks, bonds, or real estate. She also does not have a savings account, and the current balance of her checking account is $46. Ron stated that applicant has no source of income beyond the day-care center, which is no longer operational, and, thus, applicant could not make a $1.1 million dollar bond.

Ron also testified that his annual income is $45,000, and that his mother's and his sister's annual incomes are $150,000 and $55,000, respectively. He further testified that he was unaware of his father's income, although he did know that his father owned several companies involved in condo development in Nigeria and that his father owned property in Nigeria. Ron was unaware of the value of this property, but he expressed doubt that the property could be used as collateral for a bond because "a lot of it is undeveloped." The trial court admitted tax records from the Harris County Appraisal District, which reflected that applicant's parent's property in Katy was appraised at $408,860 as of January 1, 2011. Ron also stated that he did not believe that he himself could be "very much help" to applicant in a financial sense, but he would "feel very comfortable signing a bond for her." Ron provided no testimony regarding his family's attempts to procure a bond for applicant, and he did not testify regarding how much he and his family could contribute to obtaining a bond for applicant.[7]

Although applicant made no effort to demonstrate that she herself was unable to obtain a bond, she presented evidence that she lacks the financial resources to make bail. *See Milner*, 263 S.W.3d at 150. Applicant presented limited testimony regarding her family's financial resources, and she produced no evidence regarding whether an "attempt had been made to determine whether [applicant] could obtain a bond on the basis of [her] family's resources." *Id.* As a result, "the trial court could have determined that the evidence supports maintaining the present bail amount." *Id.* We note, however, that even if applicant had demonstrated that neither she nor her family has the financial ability to obtain a bond, "this element would not control over all other considerations." *Id.*

### D. Future Safety of Victim and Community

Article 17.15 requires that we also consider "[t]he future safety of a victim of the alleged offenses and the community" in reviewing the trial court's bail determination. TEX.CODE CRIM. PROC. ANN. art. 17.15(5); *Milner*, 263 S.W.3d at 150. There was no evidence introduced at the bail reduction hearing that applicant poses a further danger to the surviving victims or to the community if she is released on

---

**7.** This Court has previously taken "judicial notice that in order to obtain a bond ... a defendant must usually pay the bondsman at least 10 percent of the bail amount, and, in addition, furnish substantial collateral, often in an amount equal to or exceeding the amount of bail." *Sabur–Smith*, 73 S.W.3d at 440.

bail pending trial. Thus, this factor weighs in favor of a reduction of applicant's bail amount.

### E.  Other Factors

The State presented evidence that applicant had a juvenile adjudication for arson in 2003, when she was fourteen years old, and that she had successfully completed probation for the offense. Aside from this offense and disciplinary problems throughout middle and high school, applicant has no further criminal history, and there is no evidence that she has failed to comply with previous bond or probation conditions.

Applicant acknowledged that, after the incident occurred but before any charges had been filed, she left the United States and traveled to Nigeria. Ron testified that he and his family members frequently travel to Nigeria, that he has "a lot" of family members in Nigeria, and that most of his extended family lives in Nigeria. The State presented evidence that applicant's family in the United States and her father in Nigeria were not forthcoming with information regarding applicant's whereabouts, although her father ultimately informed Interpol and the Nigerian authorities of where applicant was staying after he was confronted with an airline ticket in applicant's name that was found in his house. The parties presented conflicting evidence regarding whether applicant was apprehended or whether she voluntarily turned herself in to authorities, but it is undisputed that she waived extradition proceedings. See Hulin, 31 S.W.3d at 761 (considering fact that defendant waived extradition proceedings as factor weighing in favor of reducing bond); see also Montalvo, 315 S.W.3d at 595 ("We acknowledge Montalvo's voluntary surrender as a factor favoring a reduction of bail.").

The State also presented evidence that applicant's family has not been helpful throughout the course of the proceedings, from restricting access to applicant when arson investigators attempted to obtain a statement from her after the fire to failing to provide information regarding applicant's location in Nigeria. Although Ron testified that his family would ensure that applicant complied with any bond conditions if she were released, the trial court could have chosen to disbelieve this testimony given applicant's family's documented uncooperativeness during the pendency of this case thus far. See Esquivel v. State, 922 S.W.2d 601, 604 (Tex.App.-San Antonio 1996, no pet.) (noting that, as factfinder at bail reduction hearing, trial court has sole duty of judging credibility of witnesses and determining weight to give their testimony); see also Ex parte Parker, 26 S.W.3d 711, 712–13 (Tex.App.-Waco 2000, no pet.) (refusing to reduce bail and noting that, "Parker fled to Louisiana when he became aware of the allegations against him and after he agreed to take a polygraph examination. Parker's mother declined to help investigators locate him").

Applicant presented evidence (1) that she lacks the financial resources to make bail at the amount currently set, (2) that she has family in the Houston area and ties to the community, (3) that she has no adult criminal record, (4) that she is not a danger to the victims or the community, and (5) that she will live with her family members, who will ensure that she complies with any bail conditions, if released. All of these factors weigh in favor of a reduction of her bond amount.

The record also includes evidence, however, that applicant is charged with nine offenses, four of which carry the possibility of life imprisonment if applicant is convicted. The bond amounts set by the trial court for each particular offense are within the ranges that this Court has previously upheld as not excessive. Furthermore, ap-

plicant presented no evidence regarding what bail amount her family can afford, and, although her brother testified that he and his family would ensure that applicant complies with any bond conditions, the State presented substantial evidence that applicant's family had been uncooperative throughout the authorities' attempts to speak with applicant and to locate her in Nigeria. There is also evidence in the record that applicant has strong family ties to Nigeria, where she traveled immediately after the incident. The State presented evidence that her father and other friends and family members attempted to shield her from Interpol and Nigerian authorities before finally revealing her location. The trial court could have reasonably concluded that applicant constitutes a significant flight risk.

Based on this record, therefore, we cannot conclude that the bail amounts set by the trial court are constitutionally or statutorily excessive. We therefore hold that the trial court did not abuse its discretion in setting applicant's bail at a total of $1.1 million for the nine charged offenses.

We overrule applicant's first, second, and third issues.

### Conclusion

We affirm the judgment of the trial court.

