

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00154-CR

———————————————————

EX PARTE ANTHONY KIENLEN

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. DC78-CR2022-0009 CT 1-16

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

In October 2021, Defendant Anthony Kienlen exchanged gunfire with law enforcement officers and engaged them in a standoff. He faces 14 counts of attempted capital murder of a peace officer, one count of deadly conduct, and one count of criminal mischief. Bail[1] is set at $100,000 for each attempted capital murder, $25,000 for deadly conduct, and $10,000 for criminal mischief—a total of $1.435 million. Defendant challenged his bail by petitioning for writ of habeas corpus, and after the trial court denied his requested bail reduction, Defendant filed this appeal.[2]

Although the cumulative $1.435 million bail is remarkably high, Defendant did not demonstrate that he had made efforts to pay the bail, nor is it clear from the record that he lacked the ability to do so. It is not even clear from the record what reduced bail amount Defendant was seeking. Therefore, in the narrow circumstances of this case—because Defendant is charged with not one but 14 first-degree felonies; because each of those felonies involves aggravating factors and carries a potential life sentence; because the triggering events that allegedly led to Defendant's actions have only grown

---

[1] "'[B]ail' and 'bond' as used in Chapter 17 [of the Code of Criminal Procedure] are interchangeable terms and may refer both to the amount set and the amount posted, depending on context." *Ex parte Gomez*, 624 S.W.3d 573, 577 (Tex. Crim. App. 2021).

[2] It is unclear if Appellant intends to challenge the $25,000 bail for deadly conduct and the $10,000 bail for criminal mischief. Nonetheless, because all of Defendant's charges stem from the same indictment and criminal episode, we liberally construe his brief as a challenge to the entirety of the $1.435 million bail amount. *See* Tex. R. App. P. 38.9.

more numerous and pronounced since his arrest; and most importantly, because Defendant failed to show that he had made efforts to pay the existing bail, that he had exhausted his resources, or that the bail was far beyond his financial ability—we will affirm.

## I. Background

Defendant is a United States Army veteran, and prior to the standoff, he was an emergency room nurse and an active member of the Wichita County community. It is undisputed that, in October 2021, Defendant's behavior caused his wife Abigail to call 9-1-1, and when the police came to Defendant's home, Defendant exchanged gunfire with them—shooting over his concrete fence line while wearing a helmet and bulletproof vest—before retreating into his home for a standoff.

The State characterizes this as a "mass-shooting event" and contends that it was prompted by Defendant's belief that Abigail was having an affair.[3] According to the State, this belief caused him to not only attempt suicide the night before and morning of the standoff but also to invite Abigail's suspected lover to the house with the stated intention of murdering him. After Abigail called 9-1-1 and the police arrived at the house (instead of her suspected lover), Defendant exchanged gunfire with the police in

---

[3]Defendant does not deny that on the night before the standoff he became aware of information that made him suspect that Abigail was having an extramarital affair.

a residential area, narrowly missing the Wichita County sheriff's head and shooting through the bedroom window of a young girl who lived on Defendant's street.

Under Defendant's theory of the case, his actions were attributable to "a mental health crisis." And while Defendant concedes that his suspicions of infidelity may have been a factor in causing the incident, he argues that the real cause was his combat-related post-traumatic stress disorder (PTSD),[4] which had grown worse in the months prior to the standoff, and for which Defendant was already seeking treatment. Defendant claims that he was attempting "suicide by cop"—not murder—and he emphasizes that no one was hurt in the "interaction."

Either way, at the end of the October 2021 standoff, Defendant met a police negotiator at the gate to his property, he was arrested, and he was later indicted for 14 counts of attempted capital murder of a peace officer, one count of deadly conduct, and one count of criminal mischief. He has been incarcerated ever since.

A magistrate set Defendant's bail at $500,000 for each attempted capital murder charge (i.e., $7 million for those 14 counts), but after Defendant requested a reduction, the trial court lowered the bail to $100,000 for each attempted capital murder, plus $25,000 for deadly conduct and $10,000 for criminal mischief—a total of $1.435

---

[4]In 2007 or 2008, after returning from combat, Defendant voluntarily admitted himself into a mental facility. In April 2009, Defendant was diagnosed with PTSD and released from active military service based on that diagnosis.

million.[5]  Defendant then sought another bail reduction by petitioning for writ of habeas corpus.  After hearing evidence, the trial court denied Defendant's request.

## II.  Governing Law and Standard of Review

The federal and state constitutions both prohibit the imposition of "[e]xcessive bail."  U.S. Const. amend. VIII; Tex. Const. art. I, § 13; *see* Tex. Const. art. I, § 11.  Bail is excessive if it is "set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests."  *Ex parte Peyton*, No. 02-16-00029-CR, 2016 WL 2586698, at *3 (Tex. App.—Fort Worth May 5, 2016) (mem. op., not designated for publication) (quoting *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd)), *pet. dism'd*, No. PD-0677-16, 2017 WL 1089960 (Tex. Crim. App. Mar. 22, 2017) (not designated for publication).  The government's primary interest, and bail's primary purpose, is to give reasonable assurance of the defendant's presence at trial.  *See* Tex. Code Crim. Proc. Ann. art. 17.01; *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977).  And the trial court must balance this interest with the presumption of innocence.  *Ex parte Hanson*, No. 02-22-00045-CR, 2022 WL 1496533, at *1 (Tex. App.—Fort Worth May 12, 2022, no pet.) (mem. op., not designated for publication); *see Ex parte Briscoe*, No. 02-15-00223-CR, 2015 WL 5893470, at *3 (Tex. App.—Fort

---

[5]When Defendant requested that his then-$500,000 bail for each attempted capital murder be reduced, he requested a bail of $50,000 on each count.  But later, when Defendant requested that his then-$100,000 bail for each attempted capital murder be reduced, he did not propose a new bail amount.

Worth Oct. 8, 2015, no pet.) (mem. op., not designated for publication) (noting that "a bail that cannot be satisfied has the potential to displace the presumption of innocence").

Setting bail is a fact-driven determination that is decided based on the unique facts of each case. *Hanson*, 2022 WL 1496533, at *1; *Ex parte Cook*, No. 02-18-00537-CR, 2019 WL 2323643, at *3 (Tex. App.—Fort Worth May 31, 2019, no pet.) (per curiam) (mem. op., not designated for publication). This determination is "governed by the Constitution and the following rules:

> 1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
>
> 2. The power to require bail is not to be so used as to make it an instrument of oppression.
>
> 3. The nature of the offense and the circumstances under which it was committed are to be considered.
>
> 4. The ability to make bail is to be regarded, and proof may be taken upon this point.
>
> 5. The future safety of a victim of the alleged offense and the community shall be considered.

Tex. Code Crim. Proc. Ann. art. 17.15 (indentation altered).[6] The Court of Criminal Appeals has identified other factors to be considered as well, including the defendant's

---

[6]The factors listed in Article 17.15 were modified during the 87th Legislative Session with the amendments taking effect December 2, 2021, and applying "to a person who is arrested on or after [that] effective date." *See* Act of Sept. 1, 2021, 87th Leg., 2d C.S., S.B. 6, §§ 10, 24 (codified at Tex. Code Crim. Proc. Ann. art. 17.15). "A person arrested before the effective date," though, "is governed by the law in effect on

6

criminal history, his length of residency, his community ties, and any aggravating circumstances involved in the offense. *Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. 1981) (listing many factors codified in Article 17.15 as well).

We review the trial court's bail determination for an abuse of discretion, viewing the evidence in the light most favorable to the trial court's decision. *Gomez*, 624 S.W.3d at 576. We will not disturb the decision if it is within the zone of reasonable disagreement. *Hanson*, 2022 WL 1496533, at *2; *Ex parte Rotter*, No. 02-21-00016-CR, 2021 WL 2006313, at *3 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op., not designated for publication); *Briscoe*, 2015 WL 5893470, at *2. The defendant bears the burden to show that the bail amount is excessive and outside the zone of reasonable disagreement. *Gomez*, 624 S.W.3d at 576; *Hanson*, 2022 WL 1496533, at *2.

### III. Analysis

Defendant has not shown that the trial court's refusal to lower his cumulative $1.435 million bail was outside the zone of reasonable disagreement.[7] First and foremost, Defendant did not demonstrate that he had exhausted his resources to pay

---

the date the person was arrested, and the former law is continued in effect for that purpose." *Id.* Defendant was arrested before December 2, 2021.

[7]The State urges us to examine the $1.435 million bail on a per-charge basis rather than a cumulative basis, and it claims that "when a defendant faces multiple charges . . . and when . . . the bail for each charge is reasonable, appellate courts may uphold [the] cumulative bail." But the State does not cite any case law from the Court of Criminal Appeals or from this court that so holds.

the bail, that he had made other efforts to pay the bail, or that the bail was significantly out of his reach. Compounding this lapse, the State offered evidence of (1) the violent nature of the attempted capital murder offenses—including the aggravating factor that Defendant's alleged crimes were committed against peace officers; (2) Defendant's potentially life-long sentences; (3) Defendant's suicidal tendencies and express disregard for his community ties; and (4) Defendant's wife's ongoing infidelity issues which, according to the State, made Defendant's crimes ripe for recurrence.

## A.    Ability to Make Bail

When setting the amount of bail, "[t]he [defendant's] ability to make bail is to be regarded," and bail may not be set so high as to be "an instrument of oppression." Tex. Code Crim. Proc. Ann. art. 17.15(2), (4). Whether bail is oppressive or not depends on the defendant's financial circumstances; bail is considered oppressive if it is set in an amount higher than the defendant can afford for the express purpose of forcing him to remain incarcerated pretrial. *Hanson*, 2022 WL 1496533, at *6. To prove that a bail amount is beyond what the defendant can afford, the defendant must establish that "his and his family's funds have been exhausted," that he "has made an effort to furnish bail in [the set] amount," or that there is an "enormous gap between what bail [the defendant can] afford[] and what bail the trial court actually set" such that attempting to make the bail would be "a useless thing." *Ex parte Skinner*, 496 S.W.2d 633, 634 (Tex. Crim. App. 1973) (holding that defendant was not required to demonstrate effort to make new bail amount because the record showed that doing so would be "requiring a 'useless thing'");

*Ex parte Stembridge*, 472 S.W.2d 155, 155 (Tex. Crim. App. 1971) ("[B]efore complaint can be heard on appeal as to the amount fixed, the accused must show that he has made an effort to furnish bail in that amount."); *Hanson*, 2022 WL 1496533, at *6 (recognizing that, "[g]enerally, a defendant must exhaust his resources and attempt to make the bail" but noting that the court would not require a "useless thing"); *Ex parte Estrada*, 640 S.W.3d 246, 255 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (concluding that, despite lack of detailed testimony, the evidence of an "enormous gap" between bail and defendant's resources was sufficient to favor bail reduction); *Ex parte Robles*, 612 S.W.3d 142, 148 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (recognizing that "a defendant generally must establish his and his family's funds have been exhausted [or] . . . show he made an unsuccessful effort to furnish bail"); *Milner v. State*, 263 S.W.3d 146, 149–50 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (similar).

Here, Defendant did not demonstrate any of these. Defendant's wife, Abigail, testified that she had contacted a bondsman about posting Defendant's bail and that the bondman charged "somewhere around $140,000" to post the cumulative $1.435 million bail. Abigail indicated that she and Defendant "weren't able to raise enough on our end" to pay the bondsman, but she did not identify how much the couple could raise, nor did she describe what efforts she or Defendant had made to "raise enough." Instead, Defendant appeared to take the position that the $1.435 million bail amount was far beyond the couple's reach. To that end, Defendant's counsel asked Abigail if

9

liquidating Defendant's "half of any community property"[8] would equal $140,000, and

she summarily responded "No, sir."

But Abigail's description of the couple's assets called into question whether the

$140,000 bondsman payment was as unattainable as Defendant alleged. Abigail testified

that she and Defendant owned a home valued at approximately $590,000 and that they

had a mortgage of approximately $480,000, netting about $110,000 in equity. Abigail

---

[8]Defendant has not cited any case law to support his implied assumption that his ability to afford bail is determined based on just one-half of the community estate. *See Ex parte Pace*, No. 03-20-00430-CR, 2021 WL 728168, at *5 (Tex. App.—Austin Feb. 25, 2021, no pet.) (mem. op., not designated for publication) (noting that a defendant claiming bail is excessive must "show[] that his funds *and those of his family* have been exhausted" or "that he made an unsuccessful effort to furnish bail" (emphasis added)); *Ex parte Tata*, 358 S.W.3d 392, 400 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (similar); *cf. Rosales v. State*, 748 S.W.2d 451, 457 (Tex. Crim. App. 1987) (considering community property for purposes of indigency determination and explaining that "spouses provide an exception to the general rule that the financial position of relatives is not to be considered"). Defendant and Abigail were still married at the time of the habeas hearing, so the community estate had not been legally divided. *Cf.* Tex. Fam. Code Ann. § 3.003(a) (establishing that "[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be community property"), § 3.102(c) (recognizing that, unless an exception applies, "community property is subject to the joint management, control, and disposition of the spouses"). There was no evidence that Abigail would prevent liquidation of any of the community assets either. Rather, Abigail's testimony implied that she was willing and able to help Defendant reach and liquidate assets. *Cf. Ex parte Pennington*, No. 14-96-01083-CR, 1996 WL 631770, at *2 (Tex. App.—Houston [14th Dist.] Oct. 31, 1996, pet. ref'd) (per curiam) (noting in bail analysis that defendant testified that he could not liquidate his real property because "it [wa]s community property and his wife w[ould] not agree to its sale"); *Ex parte Welch*, 729 S.W.2d 306, 310 (Tex. App.—Dallas 1987, no writ) (noting in bail analysis that defendant "introduced evidence of a temporary order entered in his pending divorce case enjoining the parties from selling, mortgaging or encumbering any of their separate or community property 'except as specifically authorized by order of this Court'").

stated that she and Defendant had about $4,500 in cash in their bank accounts, that she made about $75,000 per year, and that Defendant received $1,700 per month in veteran's benefits.[9]  Defendant owned a coin collection and he told Abigail "where the[ coins] were . . . [in case she] needed to go get them appraised," but she had not had the coin collection appraised and did not know the collection's value.  Defendant also owned an "older model" Ford Excursion that Abigail estimated to be worth about $15,000 to $20,000.  The drone footage of the incident showed a second vehicle as well, along with a golf cart that Defendant had used to navigate his property, to stabilize his weapon when he fired at police, and to elevate himself to shoot over the concrete wall in front of his property.  But Abigail did not mention the second vehicle or the golf cart in her testimony, and it is unclear if the family still owns them.  Nor was there any evidence regarding the couple's creditworthiness or their ability to take out a loan or second mortgage to pay for the bail.[10]

Although Abigail testified that she and Defendant had significant expenses— that she was a month behind on the mortgage and that she was having trouble paying the bills—she did not state how much those expenses were or how they compared to

---

[9]Abigail confirmed that, even though Defendant was in custody, his veteran's benefits had not stopped.

[10]Defendant also failed to address whether he had received any financial support from the numerous members of the public who, he claimed, had demonstrated at the courthouse on his behalf, signed an online petition to support him, or provided character letters for admission at his habeas hearing.

the couple's income. But, even assuming that all of the couple's monthly income went toward their monthly bills, if Defendant had liquidated a subset of the assets Abigail described—$110,000 in home equity, $15,000 to $20,000 for his vehicle, and $4,500 in liquid funds—those assets would have provided up to $134,500 of the "somewhere around $140,000" that Defendant needed to make the existing bail. The $140,000 bondsman payment was not so far beyond Defendant's reach that attempting to pay it would have been a "useless thing."[11] *Hanson*, 2022 WL 1496533, at *6–7 (quoting *Dueitt*, 529 S.W.2d at 532).

---

[11]This distinguishes Defendant's case from many of our recent high-bail cases from Wichita County. Often, when bail is set at or above $500,000, the undisputed evidence demonstrates that the amount required by the bondsman is far beyond the defendant's financial reach. Thus, we held that

- a $500,000 bail was excessive when the "[defendant's] assets, if sold, would bring less than $10,000" and defendant suggested a bail of "$50,000 to $75,000," *Ex parte Taylor*, No. 02-20-00010-CR, 2020 WL 1963788, at *6 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (per curiam) (mem. op, not designated for publication);

- a $1 million bail was excessive when the bondsman testified that she would charge $100,000 and require cosignors and approximately $250,000 in collateral, and the uncontradicted evidence showed that "[e]ven if [the defendant] took everything out of his retirement account, sold his two vehicles, sold his home, and moved onto the street, he would need cosignors to satisfy a bondsman, and he might still come up short*," Hanson*, 2022 WL 1496533, at *6–7; and

- a $750,000 bail was excessive when it was undisputed that the defendant was indigent and his mother testified that she and other family members had tried to raise money for the bail but that even if she depleted all of her accounts she could only pay $4,000, *Cook*, 2019 WL 2323643, at *4.

12

Because Defendant did not demonstrate that the bail amount paled in comparison to his resources, he bore the burden to establish either that "his funds and his family's funds ha[d] been exhausted" or that he "ha[d] made an effort to furnish bail in [the set] amount." *Stembridge*, 472 S.W.2d at 155; *Hanson*, 2022 WL 1496533, at \*6; *Milner*, 263 S.W.3d at 149–50. Abigail's description of the couple's unliquidated assets established that the couple had not exhausted their resources, and Defendant offered only conclusory testimony—Abigail's statement that she and Defendant "weren't able to raise enough on our end"— to show his efforts to pay the bail. A defendant cannot merely offer testimony "that he and his family lacked sufficient assets or financial resources to post the [existing] bond" but must "explain what efforts, if any, were made to furnish the bond." *Ex parte Scott*, 122 S.W.3d 866, 870 (Tex. App.—Fort Worth 2003, no pet.) (affirming $100,000 bail for aggravated kidnapping); *see Ex parte McKinney*, No. 02-21-00099-CR, 2021 WL 4898666, at \*4–5 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op., not designated for publication) (affirming $1 million cumulative bail—$500,000 for capital murder and $250,000 for each of two aggravated

---

In those cases, there was an "enormous gap between what bail [the defendants] said could be afforded and what bail the trial court[s] actually set," so the uncontradicted evidence demonstrated that any such attempts would have been "useless." *Hanson*, 2022 WL 1496533, at \*6–7 (first quoting *Estrada*, 640 S.W.3d at 255; and then quoting *Ex parte Dueitt*, 529 S.W.2d 531, 532 (Tex. Crim. App. 1975)); *cf. Taylor*, 2020 WL 1963788, at \*6 (rejecting State's argument that bail was affordable if defendant exhausted his family's funds and noting that "the evidence was undisputed that the family could not afford a bond sufficient to satisfy a $500,000 bail amount").

13

robberies—when defendant offered testimony that his "family had only been able to gather $500" but offered no other evidence of effort to post bail); *Ex parte Hammond*, No. 02-21-00020-CR, 2021 WL 2373467, at *4 (Tex. App.—Fort Worth June 10, 2021, no pet.) (mem. op., not designated for publication) (noting that, although defendant's mother and grandmother testified that he "did not have the money to post such a bond, they provided no evidence that they had contacted any bondsman regarding the minimum amount required to do so or made any other effort to post bail"); *Clemons v. State*, 220 S.W.3d 176, 179 (Tex. App.—Eastland 2007, no pet.) (per curiam) (noting that defendant "fail[ed] to show any effort on his part to secure a bond" and his testimony "showed that he had not attempted to find out if any friends or family members were willing or able to help him secure a bond"); *Ex parte Miller*, 631 S.W.2d 825, 826–27 (Tex. App.—Fort Worth 1982, pet. ref'd) (noting that defendant's "mother testified that [he] c[ould ]not afford to make a bond" but defendant did not "show that he had made an effort to furnish bail in the amount set").

In sum, Defendant failed to show that he had exhausted his resources in an attempt to pay the bail, he failed to explain what efforts he had taken to pay the bail, and he failed to demonstrate that there was an affordability gap that made attempting to pay the bail a "useless thing." *Dueitt*, 529 S.W.2d at 532; *Hanson*, 2022 WL 1496533, at *6–7. Defendant also failed to identify what amount he sought to have his bail

14

reduced to.[12] *See McKinney*, 2021 WL 4898666, at *4 n.4 (describing as "notable" the fact "that [Defendant] did not specify an amount he believed to be a reasonable bail for any of the charges"). "In the absence of such evidence, the complaint of excessive bail is not presented." *Ex parte Williams*, 467 S.W.2d 433, 434 (Tex. Crim. App. 1971) (affirming bail due in part to defendant's failure to present evidence of efforts made to furnish bail in the existing amount); *Ex parte Toppings*, 422 S.W.2d 459, 460 (Tex. Crim. App. 1968) (similar). *But cf. Ex parte Clark*, 537 S.W.2d 40, 42 (Tex. Crim. App. 1976) (noting that "the ability or inability of an accused to make bail does not, alone, control in determining the amount of bail"); *Ex parte Hunt*, 138 S.W.3d 503, 506 (Tex. App.— Fort Worth 2004, pet. ref'd) (similar).

## B.    Nature of the Offense

The nature of the offense supports the trial court's refusal to reduce Defendant's bail as well. This is one of the two "primary factors" we consider in evaluating a bail decision, and we take particular note of any "aggravating factors involved in the offense." *Rubac*, 611 S.W.2d at 849–50; *Hunt*, 138 S.W.3d at 506; *see* Tex. Code Crim. Proc. Ann. art. 17.15(3). Defendant's alleged offenses are disturbing, vividly documented, and full of aggravating factors.

---

[12]In a single sentence in Defendant's brief, he references a "requested bail amount of $140,000," but he does not cite anywhere in the record where this number was proposed to the trial court.

Abigail testified that, the night before the standoff, she and Defendant went out drinking and bowling, and they had a fight. When Defendant left and went home, Abigail contacted her former lover.[13] Defendant subsequently discovered that Abigail had contacted her former lover, and Defendant suspected an affair. Overnight, he attempted suicide,[14] but Abigail awoke at 4:00 a.m. and prevented him from bleeding out. Later that morning, Defendant began drinking again, and he attempted suicide again, but Abigail once again intervened.[15] When he began to yell and threaten to kill Abigail's suspected lover, Abigail called 9-1-1.

Abigail was on the phone with 9-1-1 throughout the incident that followed, and a recording of that intense phone call—spanning more than an hour and a half—was admitted into evidence. The call began with Abigail requesting police assistance and explaining that Defendant was threatening to kill himself and her suspected lover. Throughout the call, Abigail updated the 9-1-1 operator of Defendant's actions while also attempting to corral her young sons and keep them away from Defendant. She

---

[13]Abigail testified that the man she contacted was someone she "used to be friends with" and "did not have a relationship [with], but he is somebody that [she] had a sexual relationship with."

[14]Abigail described how Defendant had attempted to commit suicide the night before the standoff by "start[ing] an I.V. in his arm and le[aving] the tourniquet on" so that his arm would "bleed out."

[15]On the morning of the standoff, Abigail found Defendant "in the shower fully clothed, [and] . . . holding a scalpel . . . about to cut his arm."

updated the operator when Defendant took his automatic rifle outside to wait for her suspected lover to arrive, when he retrieved his sniper rifle and ammunition, and when he donned his army gear to engage the police. Defendant could be heard in the background of the 9-1-1 call ranting at Abigail that he was "tired of being [her] second choice," warning that "if the cops show up or if [her suspected lover] shows up, it's gunna be a shootout . . . and I'm gunna win," telling Abigail to hang up with 9-1-1 so it would "be a surprise when they get here," predicting that "a lot of cops are about to lose their lives," mocking law enforcement's marksmanship, and asking "[h]ow many cops do you think I can kill before I [get] out [of] our front gate?"

Drone footage of the incident shows Defendant—dressed in a bulletproof vest and helmet—driving his golf cart up to and along the concrete wall in front of his property, then standing on the backseat of the golf cart while balancing his rifle on the roof to shoot at the group of law enforcement officers parked down the street.

But as the 9-1-1 call progressed, it captured Defendant's vacillating emotions as well. Moments after Defendant asked Abigail "[h]ow many cops [she] th[ought] [he] c[ould] kill," he broke down crying and said that he "d[id]n't want to hurt any of them" and "just want[ed] them to kill [him]." Less than ten minutes later, Defendant referred to the police as "just as bad as the f****** Taliban," he asked Abigail again "how many [she] th[ought] [he] c[ould] kill before he g[o]t out there," and he stated that he "c[ould]n't let them kill [him]." Not long after that, he began crying again and stated

17

that he wanted the police to "shoot [him] in the f***** face and [he] want[ed] this to be over."

Finally, after talking to two police negotiators, Defendant demanded to meet one of the negotiators at the gate of his property, and the standoff ended without loss of life. But the Wichita County sheriff testified that Defendant's gunfire came "very close to [his] head," and a neighbor testified that Defendant had shot through her young daughter's bedroom window.[16]

Defendant does not deny his actions. Instead, at the habeas hearing, Defendant argued that his actions were out of character and that he had intended to commit suicide rather than murder. Defendant's evidence focused on his struggles with PTSD and on mitigating factors such as his courageous military service in Afghanistan, his attempts to seek mental health assistance, and his contributions to the community. Defendant also offered evidence to show that members of the public had supported his release by, for example, joining a demonstration at the courthouse and signing an online petition.

But whether Defendant intended to murder the police officers or just intended to threaten them enough to make them shoot him, the undisputed evidence shows that Defendant—at a minimum—repeatedly fired his weapon in the police officers' direction with the intention to at least make them fear for their safety. The commission

---

[16]The police found bullet holes in the girl's window and bullet fragments in her desk and bedroom wall.

18

of violence against a peace officer is generally considered an aggravating factor in an offense, and it carries with it a heightened level of societal condemnation. *See, e.g.*, Tex. Penal Code Ann. § 19.03(a)(1) (listing the murder of a known, on-duty peace officer as one potential aggravating circumstance that elevates murder to capital murder). This aggravating circumstance is present in all of Defendant's 14 alleged counts of attempted capital murder of a peace officer; indeed, it is what elevates these offenses from attempted murder to attempted capital murder. *See id.*

The nature of Defendant's alleged offenses, therefore, weighs in favor of a relatively high bail amount.

## C. Potential Sentence

The length of Defendant's potential sentence is the second of the two "primary factors" we consider in evaluating a bail decision. *Rubac*, 611 S.W.2d at 849. A potentially lengthy sentence heightens "the importance of setting bail sufficiently high to secure [Defendant's] appearance at trial." *Rotter*, 2021 WL 2006313, at *3 (affirming $750,000 bail for murder); *see Scott*, 122 S.W.3d at 869 (recognizing that "the accused's reaction to the prospect of a lengthy sentence might be to not appear").

Here, Defendant's 14 attempted capital murder charges are all first-degree felonies. Tex. Penal Code Ann. §§ 12.32, 15.01, 19.03(b). Each count carries the possibility of confinement "for life or for any term of not more than 99 years or less than 5 years" and "a fine not to exceed $10,000." *Id.* § 12.32. These 14 potentially life-long sentences subsume Defendant's potential sentences for criminal mischief (180

19

days to 2 years) and deadly conduct (2 to 10 years). *Id.* §§ 12.34(a), 12.35(a), 22.05(b), (e), 28.03(b)(4)(A). The sentences also create an incentive for Defendant to flee, heightening "the importance of setting bail sufficiently high to secure [his] appearance at trial." *Rotter*, 2021 WL 2006313, at *3 (affirming $750,000 bail for murder). After all, "[t]he primary purpose in setting a bail amount and the first listed factor in [A]rticle 17.15 is the reasonable assurance that the applicant will appear for court." *Hanson*, 2022 WL 1496533, at *5 (quoting *Peyton*, 2016 WL 2586698, at *4); *see* Tex. Code Crim. Proc. Ann. art. 17.15(1).

Defendant's potential sentence weighs in favor of a relatively high bail amount. *See Scott*, 122 S.W.3d at 869–70.

**D.    Community Ties and Suicidal Tendencies**

Just as the prospect of a lengthy sentence creates an incentive for a defendant to flee, his ties to the community—or lack thereof—mitigate against his willingness to flee. *See Taylor*, 2020 WL 1963788, at *6 ("The point of looking at a defendant's community and family ties is to assay the likelihood that he will appear for trial."); *Peyton*, 2016 WL 2586698, at *5 (noting that defendant's community ties gave him an incentive to stay despite the pending charges); *see Rubac*, 611 S.W.2d at 849 (listing "supportive data" that may be considered in a bail determination including "family ties[] and length of residency").

20

In this case, Defendant has substantial ties to Wichita County. He has lived in Wichita County for approximately 13 years,[17] and he owns property there. His wife, his ex-wife, and his children live there. Before the standoff, he was employed as an emergency room nurse at a local hospital. *But see McKinney*, 2021 WL 4898666, at *4–5 (affirming $1 million cumulative bail even though defendant had family ties to Wichita County). He is a U.S. citizen and a veteran who served in the Army and who receives benefits from the Department of Veterans Affairs (V.A.). Fleeing the county—let alone the country—would be a substantial sacrifice for him. The State presented no evidence that he had violated prior bond conditions or had failed to appear in the past.

On the other hand, Defendant's attempts to commit suicide and his statements during the standoff demonstrate a disregard for his community ties. It is undisputed that Defendant has threatened or attempted suicide on multiple occasions. In the 9-1-1 call recording, Abigail told the operator about an incident a year before the standoff "where he got a little bit . . . . suicidal and he held onto one of his handguns" but she "was able to get it out of his hands." Abigail also described how Defendant had attempted to commit suicide the night before the standoff and again the morning of the standoff. And Defendant's theory of the case is that he engaged in the standoff as an attempt to commit suicide by cop. Right after the standoff, when he surrendered

[17]Defendant is from Oklahoma. His parents and brother live in Oklahoma City and were described as "part of [his] support system."

21

himself into police custody, he was placed on a suicide watch at the jail. And Defendant made a suicidal statement while there, telling an officer that he would kill himself if the bail hearing did not go his way.

The "strength attributable to [a defendant's] family ties in the area . . . [is] weakened by evidence of his struggles with suicidal ideations." *Hammond*, 2021 WL 2373467, at *4; *see Rotter*, 2021 WL 2006313, at *3–4 (noting that the trial court could have found that defendant's suicide attempts minimized the importance of defendant's family ties); *Ex parte Garner*, No. 10-18-00129-CR, 2018 WL 3469834, at *4 (Tex. App.—Waco July 18, 2018, no pet.) (mem. op., not designated for publication) (noting testimony that defendant's "threats of suicide rendered her a flight risk and a danger to the community"); *Clemons*, 220 S.W.3d at 179 (construing suicidal thoughts as evidence of an "apparent lack of regard for his community ties"). And Defendant's statements during the standoff demonstrate why this is so: At one point in the 9-1-1 call recording, Abigail begged Defendant to think about his family, and he responded, "I don't give a f*** about anybody; I'm ready to die."

Overall, Defendant's community ties are counterbalanced by his suicidal disregard for those ties, making this consideration neutral.

## E.  Safety Risk

The "future safety of [the] victim of the alleged offense and the community shall [also] be considered." Tex. Code Crim. Proc. Ann. art. 17.15(5). Although Defendant

22

has no criminal history, there was evidence to suggest that his alleged offenses could recur.

It is undisputed that Defendant was angry about his wife's suspected affair in the hours before the standoff, and the State offered evidence that this anger was the primary trigger for the offenses.[18] One such piece of evidence was the 9-1-1 call, in which Abigail asked the operator to send police officers to the house because Defendant was "making threats t[o] have people come over to our house that he wants to kill that he thinks I'm cheating on him with." Defendant can be heard in the background of the call stating that "as soon as [his wife's suspected lover] gets here, I'm gunna f***** shoot him in the face." The trial court had the discretion to believe the State's evidence that Defendant's infidelity-related anger triggered the offenses. *See Hammond*, 2021 WL 2373467, at *3 (recognizing that "the trial court, as the factfinder for purposes of the habeas hearing, was in the best position to weigh [the witnesses'] credibility and the evidence as a whole"); *Ex parte Sells*, No. 02-20-00143-CR, 2020 WL 7639574, at *4 (Tex. App.—Fort Worth Dec. 23, 2020, no pet.) (mem. op., not designated for publication) (noting that the trial court, as the factfinder, was free to doubt the defendant's testimony).

---

[18]Although Defendant concedes that he was angry about his wife's suspected affair, he disputes that this was the cause of his violent actions. Defendant's mother testified that "[s]he wasn't sure" that Abigail's alleged infidelity triggered Defendant's behavior and that "[t]here could have been more going on."

And based on the other evidence presented at the bail hearing, a reasonable factfinder could have concluded that Defendant's infidelity-related anger could recur. Abigail admitted that, in the months since Defendant's arrest, she had engaged in extramarital affairs with at least two men. Abigail was cross-examined regarding several inflammatory aspects of these affairs; for example, she confirmed that she had slept with one of the men in the bed that she shared with Defendant, and she admitted that she had told the other man (an ex-boyfriend) that she was thinking about him on the day that she married Defendant. Abigail's text-message conversations with the two men were also admitted into evidence, and those conversations were even more inflammatory. The exhibits revealed that Abigail had exchanged multiple indiscreet photos with the men, told them she loved them, and even discussed marrying them.[19] Defendant was in the courtroom for all of this testimony and, presumably, had the opportunity to view the documentary evidence.

Because Defendant's alleged offenses were triggered by his suspicion that Abigail was having an extramarital affair, a reasonable factfinder could have concluded that Abigail's in-court admission to multiple, confirmed, inflammatory affairs created a significant risk that Defendant would commit similar offenses—if not more violent

---

[19]In Abigail's text messages with one of the men, she hinted that separation or divorce was "[p]robably not too far off for me, with all of this" and stated that the recent events were "[j]ust hard to come back from."

24

ones.[20]  And the risk was greater still because, if Defendant made bail, then he planned to return home—to Abigail[21]—for at least a portion of his release.[22]

If Defendant attempted to harm himself or his wife's suspected lover(s) again, and if Abigail again called 9-1-1, law enforcement would again respond, and Defendant's residential neighbors would again be at risk.  Because there was evidence that the infidelity issues that triggered Defendant's alleged offenses had only grown more numerous and pronounced since his arrest, a reasonable factfinder could have concluded that Defendant's release presented a substantial safety threat to the complainants and to other members of the community.[23]  This factor weighs in favor of a relatively high bail amount.

---

[20]There was also evidence that Defendant had exhibited violent behavior in past relationships.  The record indicates that during Defendant's marriage to his first wife, he had engaged in a physical altercation with her, Defendant's friend had to physically separate them, and Defendant's ex-wife had called the police.

[21]Abigail testified that she had spoken to Defendant's mother about coming to stay with them if Defendant were released so that Defendant's mother could supervise Defendant while Abigail was at work.

[22]Abigail testified that a V.A. social worker met with Defendant's counselor and psychologist and recommended that Defendant participate in a residential PTSD program.  From what Abigail understood, the program had a two-to-three-week wait time.  She confirmed that she would help Defendant complete the application for the program, and she asked the trial court to order Defendant to participate in the program as a condition of his bail.

[23]Indeed, the danger of recurrence was one of the key factors the trial court cited for its refusal to lower Defendant's bail:

## IV. Conclusion

Generally, absent exceptional circumstances, a cumulative bail of $1.435 million would be worrisome. *See Ludwig v. State*, 812 S.W.2d 323, 325 (Tex. Crim. App. 1991) (noting that, at the time, "th[e] Court ha[d] yet to condone a bail amount even approaching seven figures, even in a capital case"); *Hanson*, 2022 WL 1496533, at *1–7 (reversing $1 million bail for murder); *Taylor*, 2020 WL 1963788, at *1–9 (reversing $500,000 bail for aggravated robbery); *Cook*, 2019 WL 2323643, at *1–5 (reversing $750,000 bail for murder); *Peyton*, 2016 WL 2586698, at *1–6 (reversing $1 million bail for solicitation to commit capital murder); *Briscoe*, 2015 WL 5893470, at *1–5 (reversing $1 million bail for injury to a child). Nonetheless, the defendant still bears the burden to produce evidence showing that his bail is excessive and outside the zone of reasonable disagreement. *Hammond*, 2021 WL 2373467, at *3; *Rotter*, 2021 WL 2006313, at *3.

---

I have no confidence . . . that [Defendant] will comply with [the V.A. residential program] and not check himself out when it gets hard, in which case his intention is to move back home with his wife, which is clearly the trigger of this event, and the behavior that triggered the event hasn't stopped since he's come to jail. So I am extremely concerned for our community that he would go back and live in that home, so I'm going to deny the request [to reduce bail].

Again, "the trial court, as the factfinder for purposes of the habeas hearing, was in the best position to weigh [the witnesses'] credibility and the evidence as a whole." *See Hammond*, 2021 WL 2373467, at *3.

Defendant did not carry that burden here. He offered conclusory testimony that he could not pay the bail amount, but he did not establish that he had actually attempted to make the bail, that he had exhausted his resources, or that doing so would be useless. Meanwhile, the other bail considerations—the violent nature of Defendant's alleged crimes, the aggravating factors involved in those crimes, the life-long sentences those crimes carried, the revelation regarding infidelity that risked triggering further crimes, and Defendant's suicidal threats evidencing a disregard for his community ties—all supported setting a relatively high bail amount to ensure Defendant's presence at trial. While the magnitude of the $1.435 million figure makes this case a close call, on this record, we cannot conclude that the trial court abused its discretion by refusing to reduce Defendant's bail to some unspecified lower amount.

The trial court's judgment is affirmed. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 27, 2022